# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00399-CR

**Charles Reedy, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT
### NO. 3020112, HONORABLE JON N. WISSER, JUDGE PRESIDING

### O P I N I O N

Appellant Charles Reedy appeals his conviction for murder. *See* Tex. Pen. Code Ann. § 19.02(b)(1), (2) (West 2003). The jury found appellant guilty and the trial court assessed his punishment at thirty years' imprisonment. Because the jury's verdict is unsupported by proof beyond a reasonable doubt, we reverse the judgment of the district court and order appellant acquitted.

### POINTS OF ERROR

Appellant advances seven points of error. In the first two points, appellant challenges the legal and factual sufficiency of the evidence to sustain his conviction. In points three and four, appellant urges that the trial court erred in admitting the testimony of Michael Sinclaire in violation of Texas Rules of Evidence 401, 402, and 403. In the last three points, appellant contends that he was deprived of his constitutional right to the effective assistance of counsel. Based on our conclusion that the evidence presented in this case, viewed in its entirety, fails to provide proof

beyond a reasonable doubt of all the essential elements of either count alleged in the indictment, we will sustain appellant's initial points of error without reaching his remaining contentions.

## PROCEDURAL BACKGROUND

The indictment charged appellant with murder under section 19.02(b)(1) and (2) of the Texas Penal Code. *See id*. In two separate counts, the indictment alleged in pertinent part:

that CHARLES REEDY, on or about the 3rd day of December A.D. 2001, and before the presentment of this indictment, in the County of Travis, and State of Texas, did then and there intentionally and knowingly cause the death of an individual, namely, John Teller, by striking him on and about the head with a hatchet and a dumbbell and a blunt object which is unknown to the Grand Jury.

And the Grand Jury further presents that CHARLES REEDY did then and there use a deadly weapon, to wit: a hatchet and a dumbbell and a blunt object which is unknown to the Grand Jury.

And the Grand Jury further presents that on or about the 3rd day of December A.D. 2001, and before the presentment of this indictment, in the County of Travis, and State of Texas CHARLES REEDY did then and there with intent to cause serious bodily injury to an individual, namely, John Teller, commit an act clearly dangerous to human life, to wit: striking him on and about the head with a hatchet and a dumbbell and a blunt object which is unknown to the Grand Jury, thereby causing the death of John Teller.

And the Grand Jury further presents that CHARLES REEDY did then and there use a deadly weapon, to wit: a hatchet and a dumbbell and a blunt object which is unknown to the Grand Jury.

Prior to trial, the State waived and abandoned all the allegations in both counts as to "and a dumbbell and blunt object which is unknown to the Grand Jury." *See Bates v. State*, 15 S.W.3d 155, 161-62 (Tex. App.—Texarkana 2000, pet. ref'd) (distinguishing waiver/abandonment from amendment). The record does not reflect the reason for this waiver by the State. The State was

2

left with the burden of proving that either mode of the offense—intentionally and knowingly causing death pursuant to section 19.02(b)(1), as set forth in count I, or intending to cause serious bodily injury and committing an act clearly dangerous to human life that causes death pursuant to section 19.02(b)(2), as set forth in count II—was committed solely "with a hatchet." *See* Tex. Pen. Code Ann. § 19.02(b)(1), (2).

At the guilt-innocence stage of the trial, the charge submitted by the court asked the jury to resolve both counts of the indictment.[1] For whatever reason, however, the paragraphs under each count relating to the use of the hatchet as a deadly weapon were not submitted to the jury.[2] The jury returned a general verdict: "We, the jury find the defendant Charles Reedy guilty of the offense of murder as alleged within the indictment." The verdict did not distinguish between the two modes of the offense submitted.[3] When a general verdict is returned and the evidence is sufficient to support a finding of guilt beyond a reasonable doubt under any of the theories submitted, the verdict

---

[1] Although the judgment states that "the State elected to waive paragraph II [count II] of the indictment," this statement was a clerical mistake. Paragraph II was, in fact, submitted to the jury.

[2] At the penalty stage, the issue of the hatchet being used as a deadly weapon was, again, not submitted to the jury and was not made an issue or made the subject of a finding. Although the judgment further states: "Findings on Use of a Deadly Weapon: YES, THEREUPON THE STATE FOUND THAT A DEADLY WEAPON TO WIT: A HATCHET; WAS USED BY THE DEFENDANT DURING THE COMMISSION OF SAID OFFENSE," this is not a valid finding as to the use of a deadly weapon because the State was not the judge, jury, or any kind of fact finder.

[3] Appellant was sentenced on April 14, 2003. Appointed trial counsel was allowed to withdraw on that date. Without counsel, appellant filed a pro se motion for new trial on April 25, 2003. New counsel was not appointed until May 23, 2003—too late to file an amended motion for new trial. *See* Tex. R. App. P. 21.4. Appellant's pro se motion for new trial was heard and overruled June 27, 2003. On October 28, 2005, appellant's appointed counsel filed a "motion for new trial," and an amended motion on October 31, 2005. No action was taken on the belatedly filed motions for new trial.

3

will be upheld. *Swearingen v. State*, 101 S.W.3d 89, 95 (Tex. Crim. App. 2003); *McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997); *Rabbani v. State*, 847 S.W.2d 555, 558 (Tex. Crim. App. 1992); *Fuller v. State*, 827 S.W.2d 919, 931 (Tex. Crim. App. 1992); *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991).

Here, as will be detailed below, the evidence was insufficient to support a guilty verdict against appellant for the murder of John Teller as alleged in the indictment. Namely, the evidence was inconclusive as to the date of Teller's death and, relatedly, whether appellant was present in the relevant geographic area at the time of Teller's death. Further, there was no evidence presented to establish beyond a reasonable doubt that appellant used a hatchet to intentionally inflict injury or death upon Teller.

We will review the facts in some detail because the sufficiency of the evidence is challenged.

**FACTUAL BACKGROUND**

Mary Ann Mensi testified that in December 2001, she lived in an apartment complex on St. Edward's Drive in Austin. She was a graduate student at the University of Texas. On December 17, 2001,[4] Mensi took her dogs for a walk on a new path that had been cleared "fairly recently" by some bulldozing work. Mensi explained that this work had opened a path into a wooded area between her apartment complex grounds and the access road on Interstate-35. Mensi

---

[4] In her testimony, Mensi simply answered "yes" to questions of the prosecutor asking if she recalled the "date of December 21st, 2001," and what happened that day. All other evidence shows the events occurred on December 17, 2001.

walked down the path and then down another path curving through the wooded area. Mensi came upon what appeared to be "a homeless camp" and smelled the pungent odor of a decomposing animal or human. Mensi returned to her apartment and called 911. She met Austin Police Officers Feinartz and Rodriguez, who responded to the 911 telephone call, and directed them to the campsite.

The officers found a body in the campsite outside a tent. They left the scene undisturbed and called E.M.S. and the Austin Police Homicide Unit. Police homicide investigators responded. They found a man's body lying face down on a rug covered with a blanket. Removing the blanket, it was observed that the body was nude except for a sweater on the upper body and socks on the feet. A pair of pants and underwear and a pair of boots were lying nearby. One officer also found a pair of eyeglasses near the body containing some light colored or blond hair.[5] A cot with blankets and a pillow or pillows was found next to the body. A blue jacket was seen under the cot.[6] The man's body was in the late stages of decomposition. The back of the skull had been crushed, leaving a gaping hole from one side to the other. Off to one side was a square-shaped indentation within the larger hole, approximately one inch by one inch in size. All of the brain tissue and eyes were missing, eaten apparently by animals or maggots.

A wallet was discovered lying close to the body containing a California driver's license and a social security card, both issued to John Irving Teller, Jr. Fingerprints taken from the body matched Teller's known fingerprints on file with the Austin Police Department.

---

[5] The hair was never tested to determine its possible origin.

[6] The blue jacket was collected, but was not tested for blood prior to trial.

A Bank of America envelope postmarked November 21, 2001, and addressed to Charles Reedy, Jr. (appellant) at the Austin Labor Depot on South Lamar Avenue was found in the fire pit at the campsite.[7] Scraps of a burnt newspaper's "Employment Guide," dated December 3 to December 9, 2001, were also found in the fire pit. It was shown from other evidence that this weekly circulation of job advertisements was available to the public as early as December 1, 2001.

Among the items collected at the scene on December 17, 2001, were a ten-pound dumbbell, a three-liter soda bottle, and five empty "Kentucky Deluxe" whiskey bottles. In the tent at the campsite were found an axe, a tarp, a tea kettle, a Coleman stove, "food stuff," blankets and pillows, and camping equipment. Swabs were taken from the mouths of the bottles collected. Tests performed on the swabs from the soda bottle and one whiskey bottle showed a mixture of DNA from Teller and appellant with no indication of additional contributors. Another whiskey bottle swab, when tested, revealed only appellant's DNA. The first swab on the left end of the dumbbell was positive on the presumptive test for blood. Later DNA tests on the dumbbell were inconclusive.

Dr. Vladimir Parungaó, deputy medical examiner of Travis County, performed the autopsy on December 18, 2001. He found Teller's body in an advanced stage of decomposition and estimated that the body had been decomposing for a "few days to a few weeks." He explained that decomposition of a body may be affected by the weather and the filthiness of an area. Animals, flies, and insects may be attracted to the body, causing it to be consumed faster. Dr. Parungaó stated that it would be difficult to determine the exact date of death. The doctor found a skull defect in the head

---

[7] The evidence reflects that appellant did day work at various jobs obtained from the Labor Depot.

6

from the left temporal area to the right parietal area with the exposure of the cavity, which was empty. He could not determine the number of injuries to the head because of decomposition and because insects had eaten all of the surrounding area. Dr. Parungaó also found that the body had "washerwoman skin" on the feet, indicating that the skin in that area had been soaked in water for some time. He could not say when this occurred.

When asked his opinion of the cause of death, Dr. Parungaó stated that Teller died "as a result of a fracture due to blunt trauma to the head." When asked if the blunt trauma could have been caused by a hatchet or small axe, the doctor answered, "anything similar to that, yes sir." He explained that "a lot of instruments" could have caused the injuries observed; a hatchet or any instrument strong enough to crush the skull could cause the same finding. Dr. Parungaó then added, "So, I can't tell you that—not for sure; that injury like this can be caused by the instrument [hatchet] that counsel here tell me [sic]." The doctor's autopsy report was introduced into evidence.

In investigating Teller's background, detectives found three women in Austin who knew Teller. They all testified. Jeri Denny, age 48, testified that she met Teller in 1986 near Syracuse, New York. Her two daughters were young at the time. Denny and Teller became friends and later lived together. Still later, they moved to Southern California. After nine years, they separated. Eventually, they both moved to Austin, Texas. They remained friends and were in contact. Denny knew of Teller's subsequent girlfriends. Denny acknowledged that Teller had a drinking problem, which became more acute over the years. Denny last saw Teller on October 30, 2001, when he came to her home to work on her automobile. At the time, Teller was living with

7

"Stephen" in south Austin. Prior to learning of Teller's death, Denny was told by Stephen that Teller had "moved out."[8]

Nicole Denny Derringer, Denny's daughter, maintained a friendship with Teller after he separated from her mother. She looked upon him as a stepfather. Nicole knew Teller had a drinking problem. Nevertheless, she allowed Teller to stay at her Austin home during the summer and into the fall of 2001. When Nicole discovered that Teller had used her A.T.M. card without her permission, she moved Teller to the Salvation Army in "the middle or latter part of November, 2001." Later, she visited him "a couple of times" at the Salvation Army.

Shelly Joslin, Teller's girlfriend during the last year of his life, testified that he had called her from the Salvation Army "a couple of weeks" before his body was found. He told her that "he was hanging out with a friend named 'Charles.'" She did not know "Charles" and did not recall that Teller had said anything else about him.

Early in the investigation, the officers became aware of an earlier incident involving a homeless man named Michael Sinclaire. On November 23, 2001, Sinclaire had called 911 and reported a dead body in the woods. At trial, Sinclaire, a thirty-nine-year-old alcoholic transient, testified for the prosecution about these events. Sinclaire wore glasses, had poor vision, and was capable of seeing at a distance of only six to eight feet. He admitted that he drank a beer that morning prior to testifying and that he needed four beers a day to function.

---

[8] The "Stephen" mentioned in Jeri Denny's testimony was not otherwise identified and did not testify.

Sinclaire stated that, in the latter part of the afternoon on November 23, 2001, he was holding a "homeless" sign and panhandling on the access road at I-35 and Oltorf Street in Austin. A man, whom he later knew only as "Charlie," passed by, and they exchanged brief greetings. Charlie then entered the nearby wooded area. When Charlie returned, he told Sinclaire that he was going to buy a hatchet and offered Sinclaire a six-pack of beer in exchange for Sinclaire's help in clearing bamboo from Charlie's campsite and building a picket fence. Sinclaire agreed. Charlie returned with the beer and a new hatchet purchased at Wal-Mart. He led Sinclaire to the camp. Charlie told Sinclaire that the camp was to be called "Charliewood." They both began taking turns using the hatchet to clear bamboo. Charlie began to drink whiskey, and Sinclaire drank the beer.

After an hour of working and drinking, Sinclaire thought Charlie wanted to say something, but was too embarrassed to do so. Although there had been no sexual advances, Sinclaire "believed" that Charlie was about to reveal that he was gay. Instead, Charlie asked, "What if I tell you that there is a dead body in the tent?" Charlie told Sinclaire that he got in a fight with "another guy across the way," "did what he had to do," and "knocked the back of his head in." Charlie joked that Sinclaire could "say anything you want. He ain't going to care," and pointed to the tent. Sinclaire noticed a rug rolled up inside the tent and became anxious. Charlie said that there were four other bodies out in the woods that would never be found. Charlie then asked Sinclaire if he would help "bury or kill" someone. Sinclaire was unsure of the exact wording. He became nervous and thought about the police finding his fingerprints on the beer cans. Sinclaire stated that Charlie told a joke that was not funny, and then smiled and said, "You know, I like to kill. I really like to kill."

9

At this point, Sinclaire had the hatchet in his hand. Charlie asked for the hatchet and reached for it. Frightened, Sinclaire used the hatchet to strike a glancing blow, knocking loose the watch on Charlie's right arm. An argument ensued, and Sinclaire fled. Taking a shortcut, Charlie cut off Sinclaire down the path. He implored Sinclaire: "Man, give me the hatchet, please." Sinclaire threw the hatchet into the woods and ran towards the highway. Charlie did not pursue him, but started looking for the hatchet. Sinclaire reached an office building and called 911. Officers Richardson and Henderson responded to the report of a dead body in the woods. Sinclaire led the officers to the wooded area. He had difficulty finding the campsite. Sinclaire testified that the officers stumbled upon other camps in the area, scaring the people there. Because of fatigue and poor eyesight and because it was getting dark, Sinclaire gave up the search. The officers agreed that they would return for him. Sinclaire never identified appellant as "Charlie" nor was he shown or asked to identify a hatchet.

Officer Larry Richardson testified that he and Officer Henderson contacted Sinclaire after the 911 call and that Sinclaire "was bouncing off the wall trying to tell me what happened." After Sinclaire quit the search, the officers finally found a campsite fitting Sinclaire's description. They found a man sleeping inside the tent with a hatchet beside him. Officer Richardson reported that, when the man awakened, he reached for the hatchet as if he was scared. The man obeyed the officer's command not to touch the hatchet. Officer Richardson described the man as "very intoxicated." He confirmed the man's identity by checking his Alabama I.D. card. In court, Officer Richardson identified appellant as the man he had found in the tent. Officer Richardson also found a rolled-up tarp behind the tent. He cut it open and found carpet, but no body. Officer Richardson

10

searched every place that he could think of where a body might be found without success. Finding that appellant had no criminal record and the only offense was intoxication in his own camp, Officer Richardson left appellant and the scene and made a report of the incident. At trial, Officer Richardson was not shown a hatchet for the purpose of identification nor did he describe the hatchet that he saw.

Based on the letter addressed to appellant found at the campsite, the police report of the November 23 incident, and other information, police investigators located appellant in Alabaster, Alabama, at his ex-wife's house.[9] With the assistance of local authorities, appellant was taken into custody. Austin detectives Robert Merrill and Eric DeLos Santos arrived in Alabaster on December 20, 2001, and interviewed appellant on that date at the police station. The interview was videotaped and introduced by the State into evidence. It contained appellant's denial of the offense and his claim that he had a friendly relationship with Teller.

When the interview commenced, appellant asked what the interview was "all about." He was instructed by the detectives just to answer the questions. In response to the questions, appellant stated that he arrived in Austin in July 2001, lived in a tent near I-35 and Oltorf Street, and worked day jobs from the Labor Depot. He admitted that he had a drinking problem and that whiskey was his drink of choice. Appellant thought, although he could be wrong, that he had left Austin on December 1 or 2, 2001, to return to Alabama to get his life back together and "to get back" with his ex-wife; that he had been considering the trip for a month or so before he left; that he had

---

[9] The record contains references to this woman both as appellant's "wife" and "ex-wife." For ease, we will refer to her as appellant's ex-wife.

called his ex-wife collect to let her know that he was returning; that it took him four or five days to hitchhike to Alabama; that he arrived in Alabama on December 6 or 7, 2001; and that his ex-wife would know the exact date.

Appellant acknowledged that on one occasion law enforcement officers visited his camp (apparently referring to the November 23 incident). Appellant revealed that he was too drunk to recall what happened. When asked by Detective Merrill if he remembered a "Mexican guy who could not see too well" (referring to Sinclaire), appellant admitted knowing him, but not his name. Appellant added, "he's not all there."

Appellant stated that when he departed Austin, he left his camp in the hands of a friend, "John" from California.[10] John had been living at the Salvation Army, but wanted another place to stay. Appellant testified that he allowed John to sleep in the camp on a cot outside the tent. He and John had "borrowed" the cot and other items from another campsite when the occupants were absent. Appellant recalled that John was unemployed and that they had discussed going to the Labor Depot in hopes John could find work. Appellant estimated that John stayed at the camp two days before appellant left. When Detective Merrill asked if anyone else ever slept at the camp, appellant stated it was possible because "there's a lot of people out in the woods." The detective agreed, saying, "yeah, we found quite a few of them." Appellant told the detectives that on the day he left, he and John went to the laundromat to wash clothes. They then purchased two bottles of "Kentucky Whiskey," returned to the camp, and consumed the liquor. Later, two friends of John's from the Salvation Army came to the camp. Appellant said that when he left, he told John that he would

---

[10] Appellant did not say whether or not John's last name was Teller.

12

return if the reconciliation in Alabama did not work out. He left behind some clothing and a portable television set.

At one point on the videotape, both detectives were speaking at the same time. DeLos Santos was inquiring about how long appellant had been in Alabaster when Merrill said, "Something happened to John." As DeLos Santos continued his interrogation, appellant kept asking, "What happened to John?" Merrill told appellant that his fingerprints were found in the camp and the officers had evidence placing him in the camp "much later than December 4." Appellant again asked, "What happened to John?" One of the detectives stated, "He got killed." Appellant stated that he and John "never had words" and denied that he hurt John. He repeated that he left John with John's friends who had shown up with "their own wine." The videotape clearly contained a denial of the offense by appellant.

Independent of the videotape, the evidence shows that the detectives talked to Billy Nations, appellant's ex-wife in Alabaster. She stated that her relationship with appellant was over. Detective DeLos Santos inspected her telephone caller identification and found telephone calls originating from Louisiana on December 7, from Mississippi on December 8 and 9, and from Alabama on December 10 and 11, 2001. There is nothing from this evidence to show that appellant personally made any of these calls. Billy Nations was not a witness, and the evidence does not reflect that she was asked by the detectives if these calls were from appellant. Appellant told Detective Merrill that he arrived in Alabaster on December 6 or 7, 2001. Later, Detective Merrill testified that it was determined that appellant arrived in Alabaster, Alabama, on December 7, 2001.

13

Austin Police Officer James Bixler of the Forensics Department, I.D. Section, testified that, in January 2002, he went to a wooded area near St. Edward's University in Travis County. He was acting under the direction of Detective Merrill. There was a line search of the area by the Austin Police Training Academy involving possibly thirty cadets. Officer Bixler testified that they found a hatchet; the identification card of a Carolyn House in the grassy area; a knife stuck in a tree; and a rug, burnt matches, cigarette butts, and magazines in "the campsite." The hatchet was found off a path. Detective Merrill later testified it was 60 to 100 feet from the campsite. Officer Bixler tagged the instrument as "an axe or hatchet" showing that it had been collected on January 14, 2002, at 9:30 a.m. The instrument was introduced into evidence as State's Exhibit 90. It was possible that the rug collected had some blood on it, but Officer Bixler did not check. At the time of the search, the cot and blankets that had been seen on December 17, 2001, were no longer there.

A microscopic examination of the hatchet by the State revealed only some stray blue and white fibers. There was no blood, skin or other biological material on the hatchet. There is no showing that fingerprints or other marks of identification were found on the hatchet. It does not appear that the litter of leaves under the hatchet, when found and collected, revealed any blood when examined by a D.P.S. criminalist. On December 17, 2001, when Teller's body was found, a plastic covering was observed by Detective DeLos Santos, possibly a sheath for a hatchet. If it was collected, it was not shown to fit the hatchet later found. The hatchet found (State's Exhibit No. 90) was never shown to Michael Sinclaire or to Officer Larry Richardson, who had seen appellant in possession of an undescribed hatchet on November 23, 2001.

14

Phillip Papick was the store manager for the ExxonMobil Tiger Mart at I-35 and Oltorf Street in Austin during the latter part of 2001. Papick testified that he met appellant at the store. He made an in-court identification of appellant. For two months or so prior to December 4, 2001, appellant, in work clothes, came to the store to purchase items. This occurred two or three times a week at various hours. Appellant told Papick that he had lived in someone's apartment for a time, but eventually made Papick aware that he also lived as a transient. Appellant appeared unsure what reaction Papick would have to this latter information. Papick supposed that appellant wanted to be friends with him. On one occasion, appellant told Papick that "he was kind of gay," but did not want Papick to be angry with him. Papick passed the statement "off." No sexual advances were ever made nor did Papick consider any advances were intended by the remark.

Papick related that appellant came to the convenience store on December 4, 2001. The store's non-audio videotape shows the time was a few minutes past noon. Appellant asked for Papick. Appellant told Papick that he had a "bad headache." Papick observed that the pain seemed to "really pound on appellant every few minutes" causing appellant to grab his temple. Papick examined him to see if there was any physical injury. He saw no blood or any injuries at all. Papick reported that appellant appeared anxious, but not intoxicated, though Papick remembered "the presence of alcohol." He had seen appellant intoxicated on prior occasions.

Appellant began to tell Papick that "someone may have tried to rob him. He was also talking about the fact that he might have murdered someone. And we talked about that trying to find out if it was real and. . . ." The record then reflects Papick's additional testimony:

15

A:   Well, it's hard to remember exactly what he was saying because I wasn't sure if he was talking about—he had told me previously that he has a TV—a portable TV, and so I wasn't sure if he was talking about the portable TV or he was talking about someone robbing money from him. And so it wasn't clear to me at that moment what he was dealing with. But, it felt like that the result of whatever happened is—being in a fight or whatever, someone had been trying the [sic] take something from him.

Q:   Okay. And then after that then you're saying that he said he murdered someone. Did—did he preface that with any statement to you?

A:   He might have said—it's been a while ago. It's hard to remember. He might have said something like "I don't want you to think bad of me or—that I had murdered someone."

Q:   Did he—"I don't want to think bad of me" or something like that? Did he say that once or—or more than one time?

A:   No, just probably one time. When he told me that he had murdered someone, and when I questioned back to him—"Are you sure" was my question, but he never really answered that.

Q:   And what did you say when he didn't answer?

A:   Well, I was more concerned about his pain that he had in his temple, and we were talking about that.

At one point, a police officer entered the store. According to Papick, appellant seemed concerned that Papick had called the police. The officer used the store's restroom and left. The conversation with appellant continued.

Appellant asked Papick to call appellant's ex-wife in Alabama. Papick dialed the telephone number given him, asked the woman if she wanted to talk to appellant, and handed the phone to appellant. Papick heard appellant ask for money for a bus ticket. It appeared to Papick the woman "hung up." Appellant appeared disappointed and upset, but continued to complain of his

16

headache. Appellant left the store indicating that he would find a way to get to Alabama. When his attention was directed to it, appellant picked up a small bag of clothes that he had placed by a trash can. On cross-examination, Papick admitted that he did not call the police after his conversation with appellant. He did not believe appellant's statement about a murder.

Dr. David M. Glassman, Chairman of the Department of Anthropology at Southwest Texas State University (now Texas State), testified as an expert in forensic anthropology. Dr. Glassman related that a partial human skullcap (a scala), a hatchet (State's Exhibit No. 90), a series of photographs from the crime scene, and the autopsy were submitted to him by the State. He was asked to examine the defect or fracture of the partial skull (with a piece missing apparently from the autopsy proceeding) to determine "what would be a probable cause that would cause the effect seen in a photograph of the partial skull, and to determine if the hatchet submitted was used or implicated in the fracture of the skull."

Dr. Glassman testified that his examination showed that from the pattern and direction of how the bone was ripped both on the outside and inside, and from the shape of the defect, the fracture was consistent with a blunt-type trauma as opposed to either a sharp or high-velocity trauma like a gunshot wound. The fracture was "very consistent to what we see when bone has been impacted by a blunt instrument." Dr. Glassman explained his conclusion at some length. It was consistent with that of the medical examiner, Dr. Parungaó.

When asked about the blunt side of the hatchet submitted to him and the fracture or wound, Dr. Glassman, using an unidentified diagram or photograph, stated that the hatchet submitted "will fit in this right angle as it fits in right here." The record then reflects:

17

Q:      Okay. Dr. Glassman, in your expert opinion, is the cause of the skeletal wound or the trauma—skeletal defect as you say, consistent with this hatchet or a hatchet just like it?

A:      Is it consistent with this hatchet or a hatchet just like it?

Q:      In other words, did this or something like it cause that trauma?

A:      I don't know if that caused the trauma or another hatchet caused the trauma. What this appears is that the trauma was caused by an implement that had a right angle and that was approximately 20 to 22 millimeters in diameter as is that hatchet.

On cross-examination, Dr. Glassman was asked, if the hatchet submitted caused the fatal blow, would he expect that there would be crushed bone, hair or blood on the hatchet? He responded, "possibly," and stated that it depended on environmental circumstances.

Nearly all the testimony, pro and con, came from witnesses for the prosecution. Raul Guajardo, a consultant and owner of the Forensic Chemical Services and Consulting Company, testified for the defense.[11] He received his forensic and chemical experience and training with the Texas Department of Public Safety for twenty-two years, retiring as a Criminalist VI. Without objection, Guajardo was qualified as an expert witness. He testified that, a day after the trial commenced, he obtained from the district attorney's office the blue jacket that the police had found under the cot at the campsite but had never tested. Guajardo stated that his presumptive tests on the

---

[11]  The only other defense witness was Luis Hernandez, an investigator, who detailed the defense efforts to locate Michael Sinclaire.

18

jacket's stains, front and back, were positive for blood.  He was unable to conduct additional testing for blood or a DNA analysis on the jacket's stains.[12]

Guajardo related what items should have been collected from the crime scene.  He testified a hatchet or other instrument used to kill another human being should have traces of blood, tissue, and biological matter on it, but these could disappear when exposed to the elements.

## DISCUSSION

**Legal Sufficiency**

The instant case presents a difficult question as to the legal sufficiency of the evidence to sustain the conviction for several reasons.  The exact date of the victim's death is unknown, there were no known eyewitnesses to or other direct evidence of the killing, no probative DNA evidence or fingerprints were found, and a question was even raised as to whether a hatchet, as alleged, was used.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires every state criminal conviction to be supported by evidence that a rational trier of fact could accept as sufficient to prove all the elements of the offense charged beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970); *Fisher v. State*, 851 S.W.2d 298, 302 (Tex. Crim. App. 1993); *see also* Tex. Pen. Code Ann. § 2.01 (West 2003); *Ward v. State*,

---

[12] The record includes a letter of August 3, 2005, from a criminalist at the Texas Department of Public Safety Laboratory to the Austin Police Department stating that the blue jacket had been submitted on June 1, 2005 (two years after trial), that a presumptive test for blood was positive on the jacket, and that DNA was extracted from "the stain" on the jacket, but no interpretable DNA profiles were obtained from "the jacket stain."

19

143 S.W.3d 271, 274 (Tex. App.—Waco 2004, pet. ref'd). Under the Fourteenth Amendment, the task of the appellate court is to consider all the evidence in the light most favorable to the verdict and determine if any rational trier of fact could have found beyond a reasonable doubt all the essential elements of the offense. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Sanders v. State*, 119 S.W.3d 818, 820 (Tex. Crim. App. 2003); *Cardenas v. State*, 30 S.W.3d 384, 389-90 (Tex. Crim. App. 2000). Reviewing courts are not fact finders. Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt. *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). "If, based on all the evidence, a reasonably minded jury must necessarily entertain a reasonable doubt of the defendant's guilt, due process requires that we reverse and order a judgment of acquittal." *Fisher*, 851 S.W.2d at 302 (quoting *Narvaiz v. State*, 840 S.W.2d 415, 423 (Tex. Crim. App. 1992)); *see also Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). The legal sufficiency of the evidence is a question of law. *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991); *Roberson v. State*, 16 S.W.3d 156, 165 (Tex. App.—Austin 2000, pet. ref'd).

In assaying all the evidence under the *Jackson* standard of review, a reviewing court must consider all evidence, rightly or wrongly admitted, which the trier of fact was permitted to consider. *See Conner v. State*, 67 S.W.2d 192, 197 (Tex. Crim. App. 2001); *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999); *Garcia v. State*, 919 S.W.2d 370, 37 (Tex. Crim. App. 1994); *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993). The standard of review is the same for both direct and circumstantial evidence. *Guevara*, 152 S.W.3d at 49; *Green v. State*,

840 S.W.2d 394, 401 (Tex. Crim. App. 1992). The State may prove its case by circumstantial evidence alone if it proves all the elements of the charged offense beyond a reasonable doubt. *Barnes v. State*, 62 S.W.3d 288, 297 (Tex. App.—Austin 2001, pet. ref'd).

The sufficiency of the evidence is determined from the cumulative effect of all the evidence; each fact in isolation need not establish the guilt of the accused. *Alexander v. State*, 740 S.W.2d 749, 758 (Tex. Crim. App. 1987); *Roberson*, 16 S.W.3d at 164. In analyzing a challenge to the legal sufficiency of the evidence, a reviewing court does not realign, disregard, or weigh the evidence. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000); *Rodriguez v. State*, 939 S.W.2d 211, 218 (Tex. App.—Austin 1997, no pet.). The jury as the trier of fact is the sole judge of the credibility of the witnesses and the weight to be given the testimony, and may accept or reject all or any of a witness's testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *Williams v. State*, 692 S.W.2d 671, 676 (Tex. Crim. App. 1984). The verdict may not be overturned unless it is irrational or unsupported by proof beyond a reasonable doubt. *Matson*, 819 S.W.2d at 846; *Ware v. State*, 62 S.W.3d 344, 349 (Tex. App.—Fort Worth 2001, pet. ref'd).

At first blush, viewing the evidence in a light most favorable to the verdict in accordance with the *Jackson* standard, the evidence here appears incriminating. John Teller's body was found in appellant's campsite. His skull had suffered blunt trauma from a blunt instrument of some kind, consistent with a hatchet. Appellant had purchased a hatchet on November 23, 2001. According to appellant's Alabama interview, Teller had been at the campsite for two days before

appellant left for Alabama, leaving Teller in charge of the campsite and appellant's belongings. Before leaving Austin, appellant had told a store manager that he had murdered someone.

The difficulty with the case is that there were no eyewitnesses, no direct evidence of the killing, the exact date of death was unknown and uncertain ranging from "a few days to a few weeks," the campsite was accessible to others, and appellant's connection with the offense was based in large part on circumstantial evidence.

To support a conviction for murder as alleged, the State had to prove beyond a reasonable doubt that appellant (1) intentionally or knowingly caused the death of John Teller by striking him on and about the head with a hatchet or (2) intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused the death of John Teller by striking him on and about the head with a hatchet. *See* Tex. Pen. Code Ann. § 19.02(b)(1), (2). Each element of the offense must be proven beyond a reasonable doubt for the evidence to be sufficient. *Calton v. State*, 176 S.W.3d 231, 233 (Tex. Crim. App. 2005); *Johnson v. State*, 673 S.W.2d 190, 196 (Tex. Crim. App. 1984).

Murder is a "result of conduct" offense. *Cook v. State*, 884 S.W.2d 485, 490 (Tex. Crim. App. 1994). Thus, the State must prove beyond a reasonable doubt that the accused is the person who committed the alleged offense, *Roberson*, 16 S.W.3d at 167, and that his intentional and knowing acts caused the death of the deceased. *Mavis v. State*, 3 S.W.3d 68, 70 (Tex. App.—Houston [14th Dist.] 1999), *rev'd on other grounds*, 36 S.W.3d 878 (Tex. Crim. App. 2001). "A person commits an offense *only* if he voluntarily engages in

22

conduct including an act, an omission, or possession." Tex. Pen. Code Ann. § 6.01(a) (West 2003) (emphasis added).

**Intentionally or Knowingly**

We first examine the culpable mental states alleged and their connection with the other essential elements of the offense. Intent may be inferred from acts, words, and the conduct of the accused. *Guevara*, 152 S.W.3d at 50; *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995); *Dues v. State*, 634 S.W.2d 302, 305 (Tex. Crim. App. 1982). Knowledge may likewise be inferred. *Parramore v. State*, 853 S.W.2d 741, 745 (Tex. App.—Corpus Christi 1993, pet. ref'd); *Castallano v. State*, 810 S.W.2d 800, 807 (Tex. App.—Austin 1991, no pet.). Mental culpability is of such a nature that it generally must be inferred from circumstances under which the prohibited act occurred. *Dillon v. State*, 574 S.W.2d 92, 94 (Tex. Crim. App. 1978); *Bowden v. State*, 166 S.W.3d 466, 470 (Tex. App.—Fort Worth 2005, pet. ref'd); *Skillern v. State*, 890 S.W.2d 849, 880 (Tex. App.—Austin 1994, pet. ref'd). Thus, we examine all the evidence to determine if the evidence reflects any acts, conduct, or words from which a valid inference may be made that appellant intentionally or knowingly caused the death of Teller or intended to cause serious bodily injury.

The use of a hatchet to cause death would establish that the perpetrator acted with intent to cause death. The deficiency in the State's evidence is that it did not establish that appellant was the person who used a hatchet (as alleged) to kill Teller. Appellant purchased a hatchet from Wal-Mart on November 23, 2001. He and Sinclaire used the hatchet to clear brush around the camp that afternoon. Officer Richardson, responding to Sinclaire's 911 call on the same date, found

23

appellant in the campsite with a hatchet. The State's evidence showed that appellant left Austin on December 4, 2001, and that Teller's body was discovered on December 17, 2001. A search of the campsite on December 17 revealed an axe and a dumbbell but no hatchet. The autopsy was performed the next day. A line search of the wooded area on January 14, 2002, revealed a hatchet in the leaves some 60 to 100 feet from the campsite (State's Exhibit No. 90). It was this hatchet that was submitted to Dr. Glassman. Both Dr. Glassman and the deputy medical examiner agreed that Teller's death was caused by a blunt instrument of some kind, resulting in blunt trauma, and that the use of a hatchet would be consistent with their findings.

However, the hatchet found did not contain any blood, skin, bone tissue, or other biological material that would indicate its use in killing anyone. No fingerprints were shown to have been lifted from the hatchet, and there were no identifying marks indicating ownership. Neither Officer Richardson nor Sinclaire was shown the hatchet to determine if it appeared by brand, shape, or size to be the one they had seen in appellant's possession on November 23, 2001. There was no showing of what types or brands of hatchets were sold at Wal-Mart.

If it can be inferred that the hatchet found was the same hatchet obtained from Wal-Mart on November 23, 2001, there is no evidence, direct or circumstantial, to prove beyond a reasonable doubt that the hatchet was used to kill Teller or that appellant had used it or any other hatchet to inflict death upon Teller, an essential element of the offense. This is particularly true when the evidence shows that the date of death was uncertain.

24

No inference as to a culpable mental state can be drawn from this evidence, which fails to show appellant used any hatchet or other blunt instrument to kill Teller. The evidence (or lack thereof) also raises doubt about the manner and means of the killing.[13]

Further, as to the issue of "intentionally or knowingly," we observe that there was no direct evidence of animosity or disagreement between appellant and Teller that might bear on the issue of culpable mental states. In fact, the record shows the contrary. The State offered the testimony of Shelly Joslin that Teller told her that he was "hanging out with a friend named Charles." In his taped Alabama interview with the police, appellant acknowledged "John's" presence in the camp two days before he departed for Alabama and said that they had a friendly relationship, had "borrowed" a cot for John, had discussed getting John a job, and had washed clothes and drank whiskey together. Appellant left John in charge of the camp when he left and expressly denied that he had "hurt John."

We must look elsewhere to find support for the essential elements of the offense alleged.

---

[13] In *Jones v. State*, 568 S.W.2d 847, 859 (Tex. Crim. App. 1978), the court wrote:

The main fact to be proved was that the appellant fired the bullet which killed the deceased into the deceased's forehead. None of the evidence connected with the murder directly demonstrates the main fact. The fingerprints that were "lifted" from the cold Schlitz beer can proved that the appellant handled the beer can sometime during the morning of the murder, but prior to the time when the police arrived. They did not prove that the appellant fired the bullet which killed the deceased.

**Mere Presence and Flight**

Mere presence at the scene or in the vicinity of a crime, or even flight from the scene, either standing alone or combined, is insufficient to sustain a conviction. *King v. State*, 638 S.W.2d 903, 904 (Tex. Crim. App. 1982). They are circumstances from which the trier of fact may draw an inference of guilt. *See Turner v. McKasle*, 721 F.2d 999, 1002 (5th Cir. 1983); *Thompson v. State*, 697 S.W.2d 413, 417 (Tex. Crim. App. 1985); *King*, 638 S.W.2d at 904; *Valdez v. State*, 623 S.W.2d 317, 321 (Tex. Crim. App. 1979); *Scott v. State*, 946 S.W.2d 166, 168 (Tex. App.—Austin 1997, pet. ref'd). Mere presence or even knowledge of an offense does not alone make an accused guilty of an offense. *Barnes*, 62 S.W.3d at 297.

The evidence reflects that appellant said he left Teller in the campsite as earlier described. Appellant believed that he left Austin on December 1 or 2, 2001, but was not sure. The State's evidence placed him in Austin on December 4, 2001. The deputy medical examiner was unable to pinpoint the date of death, indicating that, at the time of the autopsy on December 18, 2001, the body had been decomposing "a few days or a few weeks." Without a date certain as to the death, the proof does not show that appellant was present at the time and place when Teller was killed. *See O'Keefe v. State*, 167 S.W.2d 1035, 1040 (Tex. Crim. App. 1942). The fact that appellant may have been the last person to see the victim alive creates nothing more than a suspicious circumstance. *See Nathan v. State*, 611 S.W.2d 69, 78 (Tex. Crim. App. 1981).

The State relies upon evidence of flight. There is no dispute that appellant traveled from Texas to Alabama. Whether he was correct or not, Detective Merrill testified that appellant arrived in Alabaster, Alabama, on December 7, 2001. Here again, the uncertainty of the date of

Teller's death becomes a factor. The trip to Alabama may have occurred before Teller's death. It certainly occurred before the discovery of the crime. Thus, at the time of the trip, appellant had not become a suspect nor had an arrest warrant been issued for him.

The evidence also demonstrates an unprovoked reason for appellant's travel. In his taped Alabama interview, appellant, a homeless transient, stated that for a month or so before he left Austin, he had considered returning to Alabama to reconcile with his ex-wife. He had telephoned her several times. The convenience store manager, Papick, testified that on December 4, 2001, he made a telephone call for appellant so appellant could talk to his ex-wife. Appellant was located at his ex-wife's home in Alabama. The flight is a circumstance from which the jury could have drawn an inference of guilt only if the evidence established that appellant left Austin after Teller's death.

**Motive**

The State offered evidence that hinted at a possible motive related to speculation about appellant's sexuality, although the State in its appellate brief does not mention or rely on motive. The prosecution is not required to prove motive in any case. It is not an element of the crime of murder, but evidence of motive is generally admissible because it is relevant as a circumstance tending to prove guilt. *Bush v. State*, 628 S.W.2d 441, 444 (Tex. Crim. App. 1982); *Eby v. State*, 165 S.W.3d 723, 727 (Tex. App.—San Antonio 2000, pet. ref'd); *Miranda v. State*, 813 S.W.2d 724, 742 (Tex. App.—San Antonio 1991, pet. ref'd); *see also* 1 Steven Goode, et. al., *Guide to the Texas Rules of Evidence* § 401.3 (2d ed. 2002). In fact, motive may be a significant circumstance indicating guilt. *Guevara*, 152 S.W.3d at 50.

27

The State offered Papick's testimony that appellant frequented his store several times a week for two months or so before December 4, 2001, and that, on one occasion, appellant told Papick that he "was kind of gay." However, no sexual advances were ever made, and Papick passed the matter "off." Appellant was also in the store on several occasions when Papick believed appellant to be intoxicated.

Detective Merrill testified that Teller was nude from the waist down except for socks when the body was found. Merrill thought from appearances that someone had "shucked off" Teller's pants and underwear, which were lying "fairly close" to the body. The record shows that no request was made to have the medical examiner determine if the body reflected evidence of any recent sexual activity. The pants and underwear were not tested, nor was the rug upon which the body was lying. The cot, blanket, and pillows were not collected, and they later disappeared.

Detective Merrill testified that in Alabaster, Alabama, he saw some healing injuries or marks on appellant's ear and the hairline on his head. Photographs were taken of these marks on December 20 or 21, 2001, after appellant had hitchhiked to Alabama and been there almost two weeks. The photographs of these minor injuries were introduced, but were never tied to any cause. Papick testified that appellant came to the Tiger Mart in Austin on December 4, 2001, complaining of a severe headache. Papick examined appellant's head and found no blood or physical injuries or marks.

Sinclaire testified that when he was at the campsite on November 23, 2001, he "thought" appellant was about to tell him that he (appellant) was gay. However, appellant did not say that, and no sexual advances were made. Sinclaire's mere subjective thought was not probative evidence tending to prove motive.

28

The State made an effort to have the three female witnesses who knew Teller testify that Teller was heterosexual. No female associated with appellant testified.

Officer Richardson related that when he checked on November 23, 2001, appellant did not have a criminal record. The State did not offer evidence to contradict this testimony.

The evidence related to motive was insufficient alone to establish beyond a reasonable doubt appellant's identity as the perpetrator of the murder charged.

**Appellant's Statements to Papick**

In its jury arguments, the State indicated that appellant "confessed the crime" to Papick on December 4, 2001. "A 'confession' is generally regarded as an acknowledgment of all facts necessary to constitute guilt of the crime at issue." 41 George E. Dix & Robert O. Dawson, *Criminal Practice and Procedure* § 13.02 (2d ed. 2001). Papick stated, "He might have said—it's been a while ago. It's hard to remember. He might have said something like 'I don't want you to think bad of me or,—that I murdered someone.'" When Papick inquired, "[A]re you sure?," appellant never answered. The brief statement recalled by Papick did not supply the who, where, when, or how of the murder offense charged against appellant. Papick acknowledged that, at the time of the statement, appellant was suffering from pain in his temple, which concerned Papick. Papick did not see any injuries on appellant's head and did not think that appellant appeared intoxicated. Papick did, however, notice "the presence of alcohol." The significance of the statement is that it was made at a time when Teller could have been dead, according to the time period estimated by the deputy medical examiner. The statement, however, was similar

29

to those made to Sinclaire on November 23, 2001, when appellant was drinking and which were shown to be untrue.

**Sinclaire's Testimony**

We cannot overlook Michael Sinclaire's testimony about his conversation and experience with appellant at the campsite on November 23, 2001, when they were both drinking and cutting brush with a hatchet. Appellant's statements to Sinclaire—about a body in the tent, a killing, and four buried bodies in the area—were not tied to Teller's death. When the police officers searched the campsite shortly after Sinclaire's 911 telephone call, they found the tarp mentioned by Sinclaire, but it contained only carpet; they found no dead body in the area. There was nothing to show that Teller had ever been in the camp at that time. Nicole Derringer testified that she had taken Teller to the Salvation Army home in the middle or latter part of November 2001, and had later visited him twice at the home. Shelly Joslin testified that Teller called her from the Salvation Army "a couple of weeks" before his body was found on December 17, 2001.

In closing argument to the jury, the prosecutor, referring to Sinclaire's testimony about November 23, argued, "we're not trying to say he [appellant] killed the victim at that time, but he's thinking about it." Thus, the State conceded to the jury that appellant's statements to Sinclaire were not about Teller's death.

An examination of Sinclaire's testimony revealed that Sinclaire liked appellant's campsite when he saw it and thought about staying there. It was then that appellant, *inter alia*, suggested that there was a body in the tent, that appellant had killed a man in a fight, and that four other bodies were buried in the area. Sinclaire also revealed that appellant told a joke, which

Sinclaire did not consider funny, and smiled when he told Sinclaire, "I like to kill." The evidence failed to substantiate appellant's statements about a killing or killings, leaving open the inferences that appellant did not want Sinclaire to stay at the campsite or that, in his intoxicated condition, appellant was having fun scaring Sinclaire. Sinclaire's testimony provides little or no incriminating evidence that appellant killed John Teller as charged in the indictment.

**Whether Evidence Presented Was Sufficient**

The evidence in the instant case contains a number of inferences that do not by themselves constitute proof of guilt. A jury may not reasonably infer an ultimate fact from meager circumstantial evidence that simply raises a number of inferences, none more probable than another. *Lozano v. Lozano*, 52 S.W.3d 141, 142 (Tex. 2001).

To be legitimate and permissible, an inference must be described as a logical consequence of the facts present in evidence, and there must be a logical and rational connection between the facts in evidence and the fact inferred. *United States v. Michelena-Orovio*, 702 F.2d 496, 504 (5th Cir.), *aff'd*, 719 F.2d 738 (5th Cir. 1983) (en banc). With regard to the sufficiency of evidence, one inference cannot be based upon another inference in order to reach a conclusion. *Lee v. State*, 214 S.W.2d 619, 622 (Tex. Crim. App. 1948). It will not suffice. *Williamson v. State*, 244 S.W.2d 202, 204 (Tex. Crim. App. 1951). The stacking of an inference upon an inference is not considered evidence. *Citizens Nat'l Bank v. Allen Rae Inv., Inc.*, 142 S.W.3d 459, 482 (Tex. App.—Fort Worth 2004, no pet.); *see also Schlumberger Well Serv. Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 858 (Tex. 1968).

Proof that amounts to only a strong suspicion of guilt or a mere probability of guilt is insufficient to sustain a conviction. *Urbano v. State*, 837 S.W.2d 114, 116 (Tex. Crim. App. 1992); *Murray v. State*, 134 S.W.2d 286, 287 (Tex. Crim. App. 1939); *Wynn v. State*, 847 S.W.2d 357, 359 (Tex. App.—Houston [1st Dist.]), *aff'd*, 864 S.W.2d 539 (Tex. Crim. App. 1993); *Navarro v. State*, 810 S.W.2d 432, 435 (Tex. App.—San Antonio 1991, pet. ref'd) (citing *Moore v. State*, 640 S.W.2d 300, 302 (Tex. Crim. App. 1987)). Moreover, mere opportunity to commit a crime does not tend to establish the fact of the accused's commission of the charged crime. *Wilson v. State,* 184 S.W.2d 141, 143 (Tex. Crim. App. 1944). If circumstantial evidence provides no more than a suspicion, the jury is not permitted to reach a speculative conclusion. *Louis v. State*, 159 S.W.3d 236, 246 (Tex. App.—Beaumont 2005, pet. ref'd). It is the function of appellate courts to ensure that no one is convicted of a crime except upon proof beyond a reasonable doubt. *Shelton v. State*, 795 S.W.2d 162, 167 (Tex. Crim. App. 1989). Due process requires no less.

On reviewing the legal sufficiency of the evidence, we follow the *Jackson* standard as earlier noted, including viewing the evidence in the light most favorable to the jury's verdict. Moreover, the State need not exclude every other reasonable hypothesis except the guilt of the accused. *Sonnier v. State*, 913 S.W.2d 511, 516 (Tex. Crim. App. 1995); *Geesa v. State*, 820 S.W.2d 154, 155-61 (Tex. Crim. App. 1991), *overruled on other grounds by Paulson v. State*, 28 S.W.3d 570, 573 (Tex. Crim. App. 2000). Nevertheless, a reviewing court must act as a due process safeguard. The legal sufficiency of the evidence is based on due process. *Gollihar v. State*, 46 S.W.3d 243, 245 (Tex. Crim. App. 2001).

In final analysis, as the Supreme Court put it, criminal substantial due process "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."

*Michelena-Ororio*, 702 F.2d at 566; *see also Gollihar*, 46 S.W.3d at 245-46. The verdict may not be overturned unless it is irrational or unsupported by proof beyond a reasonable doubt. *Matson*, 819 S.W.2d at 846.

Here, given all the evidence, we conclude that the verdict is unsupported by proof of all the essential elements of either mode of the offense charged. The Fourteenth Amendment guarantee of due process requires that this Court reverse and order an acquittal. *See Guevara*, 152 S.W.3d at 49. Appellant's first point of error is sustained.

In view of our disposition of appellant's initial contention, we do not reach his claim of the factual insufficiency of the evidence, the complained-of evidentiary ruling, or the question as to the effective assistance of trial counsel.

## CONCLUSION

Having sustained appellant's first issue, we reverse his conviction and render a judgment of acquittal. *See Greene v. Massey*, 437 U.S. 19, 24 (1978); *Burks v. United States*, 437 U.S. 1, 17-18 (1978); *Guevara*, 152 S.W.3d at 49.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices B. A. Smith and Puryear

Reversed and Acquittal Rendered

Filed:   December 8, 2006

Publish

34