# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00399-CR

**Roy Andrew Lewis, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BELL COUNTY, 264TH JUDICIAL DISTRICT
### NO. 58876, HONORABLE MARTHA J. TRUDO, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted Roy Andrew Lewis of the offense of capital murder. *See* Tex. Penal Code Ann. § 19.03(a)(2) (West Supp. 2007). Punishment was assessed at life imprisonment. In a single point of error, Lewis asserts that the evidence is legally and factually insufficient to establish the identity of the victim. We will affirm the judgment.

## BACKGROUND

Lewis's trial lasted several days, and numerous witnesses testified for the State. The State's theory was that Lewis murdered and robbed the victim, Les Rash, Jr., whom Lewis and others had been attempting to swindle out of an inheritance. Much of the evidence at trial concerned financial transactions related to this robbery scheme. Because Lewis contests only the sufficiency of the evidence of the victim's identity, we will limit our discussion to the evidence relevant to that issue.

The jury heard evidence that Rash disappeared on or around August 31, 2005. Rash's stepmother, Hydi Rash, testified that Rash had turned 25 on August 26 and, at that time, received an inheritance of between $85,000 and $90,000. According to Hydi, Rash was planning on using the money to go into a machinery business with a friend, Jason Dowling. Rash intended to buy equipment for the business from Lewis, whom he had met through Dowling.

On the morning of August 31, Rash left his residence in his stepmother's van. Hydi testified that Rash told her that he was going to get some cashier's checks in order to buy the equipment. Later that morning, Hydi received a call from Rash on his cell phone informing her that his van had broken down on IH-35. Hydi testified that she never heard from Rash again, and his cell phone was never used again after his disappearance. The van was later located on IH-35, apparently abandoned. No keys were found inside the van. However, notes were found in which Rash had reminded himself to get cashier's checks to purchase the equipment.

The last known sighting of Rash was at a bank in Harker Heights on October 31, 2005. A security camera recorded and photographed Rash's appearance at the bank. The bank teller with whom Rash dealt testified that Rash requested two blank money orders totaling $42,000. The teller told Rash that the bank could not issue money orders in that amount. Rash then requested blank cashier's checks, but the teller told him that cashier's checks had to be made out to particular persons. After Rash provided the teller with the necessary information, the teller issued the checks, and Rash left the bank.

During the investigation into Rash's disappearance, law enforcement officers obtained information that led them to suspect the involvement of Lewis and his brother, Leo, who lived in

Illinois. On November 22, 2005, Detective Brian Thomas of the Williamson County, Illinois, Sheriff's Office, obtained a warrant to search Leo's premises. During the search, Detective Thomas and other officers recovered human remains from a fire pit behind Leo's house and from a bucket underneath Leo's porch. Thomas testified that, upon discovery of the remains, Leo admitted to the officers that he and his brother had burned a human body.

On the same day as the search of Leo's Illinois residence, Texas officers, assisted by private investigator Scott Lorenz, searched Lewis's residence in Harker Heights. During the search, officers recovered a .22-caliber rifle and a partially empty box of ammunition. While Lorenz was speaking with Lewis, he received a call from Detective Thomas informing him that human remains had been found at Leo's residence. Lorenz put Thomas on speaker phone so that Lewis could hear what Thomas was saying. Lorenz testified that Lewis asked Lorenz to repeat what Thomas had said. Lorenz recounted, "I again told him, we found human bone at Leo's house." At this point, according to Lorenz, Lewis started "making some admissions about his involvement in this murder."

Lewis was taken to the Killeen Police Department where, after being advised of his *Miranda* rights,[1] he gave a written statement in which he admitted killing Rash. The statement, which contained several single-spaced, typewritten pages detailing the circumstances surrounding the murder, was admitted into evidence. In the confession, Lewis explained that he and Jason Dowling were attempting "to swindle Les out of his [inheritance] money." To accomplish this, "Jason was supposed to get Les to give him blank cashier's checks and then make it look like someone ripped him off." However, "it didn't work out that way" when "the banks refused to give

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

3

Les the blank cashier's checks from his account." When Rash later showed up at Lewis's house and demanded to meet the person whom Lewis had claimed was buying the equipment, Lewis and Dowling decided to rob Rash at gunpoint. While Rash was walking around Lewis's house, Lewis grabbed a rifle and confronted Rash in the garage. In his statement, Lewis explained:

> So I walked toward the garage pretty fast and walked out the garage door moving pretty fast and I held the gun up and about that time Les was just standing there and he looked up at me and I looked up at him. I started to say hold it and about that time Jason came up behind me and it all happened so fast and my finger hit the trigger and I shot him. I shot Les in the head and he fell down. . . . Les fell and I guess he was still moving and Jason said he's still moving[,] shoot him again. I pulled the trigger and I don't know where I hit him. I'm assuming it was somewhere above the shoulders while he was lying down. I don't think he was alive after I shot him the first time so the second shot was to make sure he was dead. I pulled the bolt back once for each shot.

Lewis further admitted to deciding to transport the body to Illinois:

> I already had a trip planned to go to Illinois to pick up my parents['] furniture to get the rest of their stuff. . . . Jason made the suggestion that I take the body with me to Illinois and get rid of it saying that would be the only safe way. I asked Jason how could I keep from the body smelling up the garage and we came up with the idea to get a freezer and put him in the freezer to keep it cold until I left.

Lorenz testified that after Lewis made his statement, Lewis returned to his house with the officers and "reenacted" the killing. While they were in the garage, the officers discovered and collected spots of blood from a work bench. Brent Watson, a DNA lab technician with the Texas Department of Public Safety, compared the DNA from the blood with DNA recovered from a cap belonging to Rash. Watson testified that, although he discovered DNA on the cap from two different "contributors," he believed that the major contributor of the DNA found on the cap was Rash.

4

Watson also testified that he determined, to a reasonable degree of scientific certainty, that the DNA profile obtained from the blood on the work bench at Lewis's house matched Rash's DNA profile from the cap.

The jury also heard evidence from Lewis's brother, Leo, who testified under subpoena for the State. According to Leo, around November 2, 2005, Lewis, accompanied by a friend, Rick Fowler, arrived at Leo's property in Illinois. They were in possession of a large freezer. Lewis, Fowler, and Leo moved the freezer to Leo's storage shed. Leo testified that, when Fowler was not around, Lewis told him that there was a body in the freezer that belonged to "some guy he had a problem with." Leo added, "He had said that the guy tried to rip him off or something of that nature." The State also elicited the following testimony from Leo:

Q:    What did he say he did to the guy?

A:    Shot him.

Q:    Where did he shoot him?

A:    In the head.

Q:    How many times did he shoot him?

A:    He said twice.

Q:    Did he tell you what he shot him with?

A:    I think he said a .22 rifle.

Leo also testified that Lewis had told him that Fowler knew nothing about what had happened or that there was a body in the freezer.

5

The next morning, after Fowler went into town "to wash his truck or something," Leo and his brother decided to burn the body:

Q:      After he left, did you start a fire in that pit?

A:      Yes.

Q:      Was it a big fire?

A:      Yes.

Q:      Did you and Andy pull that freezer out of the shed while Rick was gone?

A:      Yes.

Q:      Did you dump that body out of that freezer?

A:      Yes.

Q:      What did you put it into?

A:      A wheelbarrow.

Q:      And did you take that wheelbarrow down and put the body on the fire?

A:      Yes.

The next day, Lewis and Fowler returned to Texas. Leo testified that the fire was still burning when they left. In fact, according to Leo, he kept the fire burning constantly for between three and four days. Leo explained that after the fire cooled, he decided to go back to the pit and clean it out. He gathered up pieces of bone, and placed them in a five-gallon can. Approximately one week later, officers executed the search of Leo's residence and discovered the remains.

6

Dr. Harrell Gill-King, a forensic anthropologist, examined the remains. Dr. Gill-King testified that the remains were bones and teeth of a human male between 22 and 30 years old. Dr. Gill-King observed that the shape of the hand bones indicated that the victim had "fairly powerful hands." Gill-King was then asked, "In that regard, Doctor, assuming hypothetically that the individual we're talking about in this trial was a 25-year-old white male who was trained as and worked as a machinist, would your findings be consistent with an individual of that description?" Gill-King answered,

> I can't address the issue of ancestry from the bones that I have. I can't say whether the person is black or white, whatever. With a few more components we could go that way but we can't here. However, clearly male, clearly a person in middle 20s sounds fine to me.
>
> As far as machinist is concerned, that is one of the occupations that would certainly probably cause one to have this kind of mechanical change in bone that I just described. I presume [] machinist[s] use their hands in a forceful way.

Earlier during the trial, the jury had heard evidence that Rash had experience as machinist.

Dr. Gill-King also testified that the bones were burned "in a fairly fresh state as opposed to some bones that were scooped up clearing a field that had been out there five or ten years." However, according to Gill-King, it was not possible to determine from the remains whether the victim had been killed by a bullet. Gill-King explained,

> When we work these kind of arson scenes, we always make sure that we do a metal sweep because very often in a fire if a person has a bullet lodged in their body, it may either melt or it may sift through the body as the body decomposes and never be discovered. Or, a bullet can pass entirely through somebody . . . . So if a person is killed with a bullet and then their body is emulated like this, you might find a bullet, you might not. More often you would find melted material.

7

The jury also heard testimony from Dixie Peters, a forensic DNA analyst, that no DNA could be extracted from the remains because the bones had been so badly burned.

Lewis was convicted of capital murder. This appeal followed.

## STANDARD OF REVIEW

When there is a challenge to the legal sufficiency of the evidence to sustain a criminal conviction, we consider whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). We review all the evidence in the light most favorable to the verdict and assume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *See Rollerson v. State*, 227 S.W.3d 718, 724 (Tex. Crim. App. 2007); *Shams v. State*, 195 S.W.3d 346, 347 (Tex. App.—Austin 2006, pet. ref'd) (citing *Griffin v. State*, 614 S.W.2d 155, 159 (Tex. Crim. App. 1981)). It is not necessary that every fact point directly and independently to the defendant's guilt, but it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We must consider all the evidence, rightly or wrongly admitted, that the trier of fact was permitted to consider. *See Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001).

In a factual sufficiency review, we view the evidence in a neutral light and ask whether a jury was rationally justified in finding guilt beyond a reasonable doubt. *See Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); *see also Wooley v. State*,

8

2008 Tex. Crim. App. LEXIS 762, at *21 (Tex. Crim. App. 2008) (holding that factual sufficiency, like legal sufficiency, should be measured "by the elements of the offense as defined by a hypothetically correct jury charge"). We then determine whether the evidence supporting the verdict is so weak that the verdict is clearly wrong and manifestly unjust or whether the verdict is against the great weight and preponderance of the conflicting evidence. *Watson*, 204 S.W.3d at 415. "The verdict may be set aside only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Grotti v. State*, 2008 Tex. Crim. App. LEXIS 761, at *13 (Tex. Crim. App. 2008) (citing *Watson*, 204 S.W.3d at 414-17). We will not reverse a case on a factual sufficiency challenge unless we can say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict. *Watson*, 204 S.W.3d at 417.

## ANALYSIS

A person commits the offense of murder if he intentionally or knowingly causes the death of an individual. Tex. Penal Code Ann. § 19.02(b)(1) (West Supp. 2007). A person commits the offense of capital murder if the person commits the murder in the course of committing or attempting to commit the offense of robbery. *Id*. § 19.03(a)(2).

Lewis's argument on appeal is that the evidence is insufficient to prove the identity of the victim as alleged in the indictment. The indictment alleged that the victim was Les Rash, Jr. The indictment further alleged that Rash was shot with a gun. Lewis observes that "there was never any positive identification of the remains that were found in the fire pit in Illinois," that "there were no conclusive findings concerning the remains," and that the State's experts "were unable to extract

9

any DNA samples from the remains." Therefore, Lewis contends, "[t]here is no sufficient evidence that points to what or who was burned in the fire pit was Les Rash, Jr. There is not even any evidence as to how long the remains had been in the pit or in the bucket found at the home of Leo Lewis." Lewis adds that "[t]he State never proved beyond a reasonable doubt that Appellant murdered Les Rash, Jr. by shooting him, nor did they prove that it was Les Rash, Jr.'s remains found in the fire pit in Illinois."[2]

The State responds that it does not matter if the State failed to produce and identify the body of the deceased because production and identification of the body is not part of the "corpus delicti" of murder. What matters, according to the State, is that Lewis confessed to shooting Rash and that his confession was sufficiently corroborated by other evidence in the case. The State adds that it did produce some remains, and, even though the remains could not be positively identified as belonging to the victim, the other evidence in the case established circumstantially that the remains belonged to the victim.

We agree with the State. The common-law corpus delicti rule provides that no criminal conviction can be based upon a defendant's extrajudicial confession unless the confession is corroborated by independent evidence tending to establish the corpus delicti of a crime. *Fisher v. State*, 851 S.W.2d 298, 302 (Tex. Crim. App. 1993). The rule does not require that the independent evidence fully prove the corpus delicti, only that it tend to prove the corpus delicti. *Id*. at 302-03. The corpus delicti of murder is established if the evidence shows the death of a human

---

[2] The only authority Lewis cites to for his argument is *Reedy v. State*, in which this Court held that the evidence was legally insufficient to support the defendant's murder conviction. 214 S.W.3d 567, 586 (Tex. App.—Austin 2006, pet. ref'd). However, the issue in that case was the identity of the *perpetrator*; the victim's remains were positively identified. *Id*. at 572. Thus, *Reedy* is inapplicable to this case.

10

being caused by the criminal act of another. *McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997). "Under the corpus delicti rule, our task as an appellate court is to consider all the record evidence, other than appellant's extrajudicial confession . . . in the light most favorable to the jury's verdict and to determine whether that evidence tended to establish that [the victim] was actually murdered by someone. We need not concern ourselves with the fact that the State failed to produce and identify [the victim]'s body or remains, because production and identification of the victim's body or remains is not part of the corpus delicti of murder." *Fisher*, 851 S.W.2d at 303.

Here, the evidence tending to prove that Rash was murdered includes the following:

- Rash disappeared under what a jury could rationally infer were suspicious circumstances. His abandoned van was found on the side of the road, and his cell phone was never used after his disappearance.

- Police officers discovered blood in Lewis's garage that matched Rash's DNA profile.

- Lewis's brother Leo testified that he and his brother placed a body in his fire pit and burned it. According to Leo, Lewis told him that he shot this person in the head, twice, with a .22 rifle (the same kind of rifle that police officers subsequently discovered when searching Lewis's house). Leo testified that although Lewis did not tell him who this person was, he did tell him that it was "some guy he had a problem with."

- Law enforcement officers recovered the remains of a human body in a fire pit and in a bucket on Leo's property.

- Dr. Gill-King, the forensic anthropologist, testified that these remains belonged to a human male between the age of 22 and 30. At the time of his disappearance, Rash had just turned 25.

- Gill-King also testified that the bones were burned "in a fairly fresh state as opposed to some bones that were scooped up clearing a field that had been out there five or ten years."

11

After considering all the record evidence, other than Lewis's confession, in the light most favorable to the jury's verdict, we conclude that the evidence tends to establish that Rash was murdered by someone. We proceed to consider Lewis's confession in our sufficiency analysis. *See Folk v. State*, 797 S.W.2d 141, 144 (Tex. App.—Austin 1990, pet. ref'd) ("Provided there is other evidence that a crime was committed, the identity of the defendant as the perpetrator may rest alone upon his confession."). In his confession, Lewis admitted to twice shooting Rash with a rifle. According to Lewis's statement, "the second shot was to make sure he was dead." In his statement, Lewis also admitted to transporting the body to Illinois in a freezer. Furthermore, the jury heard evidence that after giving his confession, Lewis returned to the scene of the crime with law enforcement officers and "reenacted" the events of the murder.

Viewing the above evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Lewis shot and killed Rash. Thus, the evidence is legally sufficient to support the conviction. *See Vodochodsky*, 158 S.W.3d at 509; *Trejos v. State*, 243 S.W.3d 30, 56-57 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (finding evidence legally sufficient to support murder conviction despite lack of remains when evidence included confession, victim's sudden and unexplained disappearance, tests that revealed possible presence of blood in victim's home, and trained cadaver dogs alerting officers of location where victim might have been buried).

When considering the evidence in a neutral light, we reach the same conclusion regarding the factual sufficiency of the evidence. The evidence in the record contrary to the verdict consists of Dixie Peters's testimony that DNA could not be extracted from the remains, Watson's testimony that the DNA found on Rash's cap belonged to two different people, Dr. Gill-

12

King's testimony that the victim could not be positively identified, and Gill-King's further testimony that he could not determine from the remains whether the victim was shot. However, when weighing this evidence against the evidence in the record supporting the verdict, discussed earlier, we cannot say, "with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict." *See Watson*, 204 S.W.3d 417; *Jaggers v. State*, 125 S.W.3d 661, 668-69 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (finding evidence legally and factually sufficient to support murder conviction despite missing body when evidence included victim's sudden disappearance, defendant's statement to one witness that he murdered victim and statement to his mother "about being a murderer").

We overrule Lewis's sole point of error.

## CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices Pemberton and Waldrop

Affirmed

Filed: July 11, 2008

Do Not Publish