

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-12-00294-CR

Vanessa **CAMERON**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 379th Judicial District Court, Bexar County, Texas
Trial Court No. 2010-CR-4286C
Honorable Ron Rangel, Judge Presiding

Opinion by:    Rebeca C. Martinez, Justice
Dissenting Opinion by:  Karen Angelini, Justice

Sitting:        Catherine Stone, Chief Justice
                Karen Angelini, Justice
                Rebeca C. Martinez, Justice

Delivered and Filed:  September 18, 2013

REVERSED AND REMANDED

Vanessa Cameron appeals her conviction for the murder of her former boyfriend.  Because we conclude that Cameron's constitutional right to a public trial was violated during the jury selection phase of her trial, we reverse the trial court's judgment and remand for a new trial.

### FACTUAL AND PROCEDURAL BACKGROUND

On December 13, 2010, Samuel Johnson, Jr. was shot to death.  A few days later, his body was found in a cemetery.  Cameron, Johnson's former girlfriend and the mother of Johnson's young son, was charged with murdering Johnson.  The State alleged that Cameron, upset over

Johnson leaving her for another woman, concocted a plot to murder Johnson so that she could collect life insurance proceeds as Johnson's named beneficiary. A jury found Cameron guilty of murder, and the trial court sentenced Cameron to seventy years' imprisonment and imposed a $5,000 fine. Cameron now appeals.

## DISCUSSION

On appeal, Cameron argues that (1) her right to a public trial under the Sixth Amendment to the United States Constitution was violated by the trial court during voir dire, (2) the trial court erred in denying her motion to suppress her oral statements obtained in violation of the Texas Constitution, article 38.22 of the Texas Code of Criminal Procedure, and the Fifth and Fourteenth Amendments to the United States Constitution, and (3) the trial court abused its discretion in admitting rebuttal evidence of an alleged prior solicitation over her objections based on Rules 403 and 404(b) of the Texas Rules of Evidence. We begin by addressing the public trial issue.

## RIGHT TO PUBLIC TRIAL

### *Voir Dire Proceedings*

Prior to the beginning of voir dire, the bailiff ushered Cameron's family and friends out of the courtroom, stating that only the jury panel members would be allowed inside the courtroom during jury selection and there was no room for the public. When the trial judge took the bench, and before the venire panel was brought into the courtroom, defense counsel brought to the trial court's attention that the public, including Cameron's family and friends, had been excluded from the courtroom. Counsel requested that the trial court permit Cameron's family and friends to be present in the courtroom during voir dire and objected to their exclusion on the ground that Cameron was being denied her right to a public trial under the Sixth Amendment. The trial court responded that it recognized Cameron's right to have her family and friends present during voir dire, but explained that due to the sixty-five venire members and the lack of additional chairs, it

did not "see any room whatsoever where anybody else would be able to sit and observe." The court further stated, "before we called the case, we saw a pretty significant number of family members that were walking in. There is no way this courtroom can accommodate them, and I certainly appreciate the security concerns of . . . the sheriff's department. It is a public trial. It's an open trial. Certainly people have the opportunity to observe. We just don't know where to put them."

At that point, defense counsel asked if the trial court was overruling his objection to exclusion of the public. The court replied, "No, I'm not ruling. I'm just telling you, where can we put them?" When counsel reiterated that he was still requesting a ruling, the court stated, "you're objecting to something I haven't made a ruling [on]." Defense counsel stated he was asking for a ruling on his objection to exclusion of the public. The court replied, "No. No, no. The Court has never ruled that. I've never ruled that the public is excluded. All I'm saying is, where do you suggest we put them?" Counsel suggested the court could bring in chairs and place them in front of the bench, stating "we can find places to put them." The judge dismissed the suggestion as unreasonable, citing "security issues" and the "security risk" of having spectators stand next to him. The court then asked defense counsel if he would be satisfied with opening the courtroom doors and "have them all stand in 'that little hallway there' so they can observe the whole thing?" Counsel responded, "I just wanted an alternative . . . If you want to open those doors and put chairs and have people – have the public sit there, that's fine with me." The court replied that it did not have enough chairs, but "if you want, we can open up those doors in the back and have them stand to where they can observe and hear every single thing that's going on." Joining the discussion for the first time, the prosecutor stated he thought opening the courtroom doors and permitting the public to stand in that space would be a fire code violation. The court then stated, "And that – I mean, we're having issues. Counsel obviously wants her entire family

here. I mean, I don't know what else we could do. The courtroom's going to be absolutely stuffed with venirepanel members."

Defense counsel again attempted to obtain a ruling on his objection and the court again declined to rule, explaining that his objection was "premature" because the court had not ruled that the public was excluded from voir dire. When counsel explained that his objection was based on the bailiff's exclusion of the public that had already occurred prior to the judge taking the bench, the court again acknowledged Cameron's right to an open court proceeding but reiterated the lack of space and available chairs, stating "I just don't know how we could accommodate." When counsel asked if his objection was therefore overruled, the court replied, "I am telling you that you can have people in this courtroom . . . I just don't know where to put them. So I'm not making a ruling that anybody's excluded. I'm not making a ruling denying anything that you're asking because I haven't ruled on what it is that you're asking. I haven't told you that you cannot have people in the courtroom. Tell me where to put them and we'll put members of her family." Counsel stated, "okay. Thank you, Judge." During the entire exchange regarding exclusion of the public during voir dire, the prosecutor was silent except for pointing out the potential fire code violation. The venire panel was then brought into the courtroom and the voir dire proceedings began.

Later, during the middle of general voir dire, after a recess required by a venire member's need for medical attention, the court revisited the issue of the public's exclusion from the courtroom. Outside the presence of the venire panel, the court again stated on the record that it did not close the voir dire proceedings, but also added, "[d]uring the course of discussions, the Court did analyze the four-prong questions" laid out in *Waller v. Georgia*, 467 U.S. 39 (1984). The court described its *Waller* analysis as follows:

Specifically, the Court considered the size and configuration of the courtroom. 65 venirepanel members have been summoned to the courtroom. In order to accommodate all 65, there are about ten chairs that are placed in the gallery. Additionally, there are three or -- three other chairs located next to the jury box. Every single chair in the gallery and in the jury box is filled with the 65 individuals.

The court reporter is seated directly in front of the defense table directly in front of the jury box, so there would be no room there. Directly in front of the defense table there is a table used by the probation department that has a computer, a printer, some files. Directly next to the defense table is a panel that has been set up by the defense for use during voir dire. Directly behind that panel is a box where the bailiffs sit, a bailiff's table.

The Court considered the size of the configuration. [The] Court also considered alternative courts, knowing that the juries -- the central jury room is not adequately sufficient for a trial such as this. Also, the Court is expecting a potentially emotionally charged jury trial, this originally being filed, I believe, as a capital. I know that it is now a murder charge.

As such, the space within the courtroom area for the participants and the bailiffs is very narrow. The Court does not want to make any jury or potential jurors feel in any way constrained with truthfulness and honesty, making them uncomfortable in regards to potential family members next to them.

Essentially, the bottom line is the Court was concerned about safety and safety in the courtroom. Recognizing that the courtroom is not closed, Defense, before you begin your general voir dire, you're certainly able to bring in some family members and we will do our best to accommodate them in areas around the gallery where the Court, where the bailiffs feel the security will not be an issue.

This is the last reference to exclusion of the public made on the record during trial. There is no indication in the record that any of Cameron's family or friends were permitted inside the courtroom during the remainder of voir dire, or that the courtroom's doors into the foyer area were ever opened or that any member of the public stood there during voir dire.

*Motion for New Trial*

After Cameron was convicted and sentenced, she filed a motion for new trial alleging her right to a public trial was violated during voir dire. Cameron's motion included twelve affidavits by her friends and family, including her mother, stating that the bailiffs excluded them from the courtroom before voir dire began and they did not witness any of the voir dire proceedings. Most

of the affiants declared that they left the courthouse for the day after being excluded from voir dire. In her affidavit, Cameron's mother states that she asked the bailiff whether she could sit on the floor, but he refused her request, stating she would be a security risk. Cameron also attached an affidavit by an attorney on an unrelated case who witnessed the bailiffs clearing the courtroom before the venire panel was brought inside. The State filed a response, attaching affidavits from the two bailiffs stating they did not close the courtroom to the public during voir dire. In his affidavit, one bailiff admits that Cameron's mother asked to sit on the floor during voir dire and he refused based on security reasons. The State also submitted proposed findings of fact and conclusions of law. No hearing was held on the motion for new trial, and it was overruled by operation of law. The court adopted the State's proposed findings and signed the written findings of fact and conclusions of law reciting, in part, that "[t]he Court <u>never</u> ruled that observers were excluded from the voir dire or any other part of the trial in this case."[1]

*Analysis*

Under the Sixth Amendment, an accused has the right to a public trial in all criminal prosecutions. U.S. CONST. amend. VI; *Presley v. Georgia*, 558 U.S. 209, 212 (2010) (per curiam) (Sixth Amendment right to public trial was created for benefit of the accused). The right extends to the jury selection phase of trial, including voir dire of prospective jurors. *Presley*, 558 U.S. at 212-13. The longstanding right to a public trial serves important societal interests of ensuring fairness and accountability in the judicial system. *Press-Enterprise Co. v. Superior Court of Cal.*, 464 U.S. 501, 508 (1984) (addressing the right to a public trial under the First Amendment which extends to the press and public). The right to a public trial is not absolute, however, and must give way to other competing rights or interests under certain, rare circumstances. *Waller v. Georgia*,

---

[1] All of the trial court's written findings of fact and conclusions of law are set forth verbatim in the dissenting opinion.

467 U.S. 39, 45 (1984). In *Waller*, the Supreme Court provided standards for courts to apply before excluding the public from any stage of a criminal trial, stating, "[T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Id.* at 48. Violation of a criminal defendant's right to a public trial is structural error that does not require a showing of harm. *Johnson v. United States*, 520 U.S. 461, 468-69 (1997); *Steadman v. State*, 360 S.W.3d 499, 510-11 (Tex. Crim. App. 2012).

In determining whether any portion of a trial was closed to the public, the focus is not on whether the defendant can show that any person was actually excluded. *Lilly v. State*, 365 S.W.3d 321, 331 (Tex. Crim. App. 2012). Rather, we look to "the totality of the evidence and determine whether the trial court fulfilled its obligation 'to take every reasonable measure to accommodate public attendance' . . . ." *Id.* (quoting *Presley*, 558 U.S. at 215). It is the trial court's duty to consider all reasonable alternatives to accommodate the public—the duty does not fall on the parties to suggest reasonable alternatives. *Presley*, 558 U.S. at 214; *Steadman*, 360 S.W.3d at 505 (no burden on defendant to proffer alternatives). Placement of this duty on the trial court is based on the premise that "[t]he process of juror selection is itself a matter of importance, not simply to the adversaries but to the criminal justice system." *Presley*, 558 U.S. at 214 (quoting *Press-Enterprise*, 464 U.S. at 505). The United States Supreme Court specifically recognized "reserving one or more rows for the public; dividing the jury venire panel to reduce courtroom congestion; or instructing prospective jurors not to engage or interact with audience members" as reasonable alternatives to accommodate the public during voir dire. *Presley*, 558 U.S. at 215; *Steadman*, 360 S.W.3d at 505.

The dissenting opinion suggests that *Lilly* requires a sequential two-part analysis: first, the defendant has the burden to show that his trial was closed to the public; then, only after closure is established does the reviewing court consider whether the trial court failed to take every reasonable measure to accommodate public attendance at trial. To the contrary, *Lilly* instructs us that in determining whether the trial was closed we look at the totality of the circumstances — which includes a determination of whether the court took every reasonable measure to accommodate public attendance. *See Lilly*, 365 S.W.3d at 331. As described in *Lilly*, the analysis is one broad inquiry, not a two-step process. This interpretation of *Lilly* is supported by the substance of the opinions on this issue, as well as by the very structure of the Court of Criminal Appeals' opinion in *Lilly*. In the opinion, the Court discusses the trial court's obligation to take every reasonable measure to accommodate the public under the heading "Was Appellant's trial closed?" *See id.* at 330-31. This indicates that the Court of Criminal Appeals views the analysis as a broad inquiry, not a sequential two-step analysis in which the question of reasonable accommodations is not reached unless the defendant proves the trial was closed. In addition, the United States Supreme Court in *Waller* phrased its four-part test, which includes whether the trial court considered reasonable alternatives to closure, as a standard for courts to apply before excluding the public from any stage of a criminal trial. *See Waller*, 467 U.S. at 48.

The instant case presents an unusual situation because no party sought to close the trial to the public. Defense counsel emphatically requested that Cameron's family and friends be allowed into the courtroom to observe the voir dire proceedings. The trial court was equally adamant in its insistence that it had not closed the courtroom to the public—there simply was no more room. Despite giving deference to the trial court's written findings, the record shows that members of the public were, in fact, excluded from the courtroom during the jury selection phase. Defense counsel stated on the record that the bailiffs told Cameron's family and friends to leave the courtroom

before the venire panel arrived and before the judge took the bench.  The State did not counter that assertion of fact.  Cameron's counsel then engaged in a lengthy discussion with the trial judge concerning his objection that the public had been excluded from voir dire.  Again, the State remained silent.  Although the trial court repeatedly stated that it was not excluding the public from voir dire, the court stated several times on the record, before and during voir dire, that there was not enough room for any spectators inside the courtroom, that all available seats were occupied by venire members, and that unspecified "security issues" foreclosed accommodating the public anywhere inside the courtroom.  Even the court's written finding No. 14, stating, "If observers had entered after the jury panel was seated, they would have been allowed back in the courtroom by the court during the proceedings in this case" implies that no public observers were present during voir dire.  Again, the defendant need not show that any one person was actually excluded.  *See Lilly*, 365 S.W.3d at 331.  However, it is undisputed that Cameron's mother was excluded from the courtroom during voir dire.  Even if we acknowledge that she asked to sit on the floor and the bailiff denied her request because it presented a security risk, there is no showing that any attempt was made to provide a reasonable, yet secure, accommodation for her to attend her daughter's trial.  Placing an extra chair in the courtroom, propping open the courtroom doors to allow observers in the foyer, or splitting the venire panel were all arguably reasonable accommodations, but the record does not show any were actually employed.  Instead, the record before this Court indicates that no one other than the venire panel, counsel, and court staff was accommodated in the courtroom during voir dire.  Thus, despite the trial judge's insistence that he had not closed the courtroom, the record shows it was, in fact, closed.

Even if we assume the one alternative offered by the trial court — to allow the public to stand in the foyer leading into the courtroom — was a "reasonable alternative," the record does not show it was acted on or made available by the court.  After defense counsel requested chairs

and the court stated there were none, the record does not show whether, in fact, the courtroom doors were opened up into the foyer to allow spectators to stand there.[2] The record is simply silent on whether this accommodation offered by the trial court was indeed provided. The trial courts are directed to take action in providing reasonable accommodations, not merely to offer or suggest an accommodation. *Lilly*, 365 S.W.3d at 331 (noting trial court's obligation "to *take* every reasonable measure to accommodate public attendance") (emphasis added) (quoting *Presley*, 558 U.S. at 215). In light of the trial court's affirmative duty to take action, we cannot agree with the State's contention, and the dissenting opinion's suggestion, that the court's obligation was somehow relieved or met when defense counsel "implicitly rejected the trial court's offer" by requesting chairs be placed in the foyer. The court's offer was simply not enough to fulfill its duty; action was required.

In addition, the record is clear that the trial court did not consider one of the key alternatives specifically mentioned in *Presley* as a reasonable accommodation for the public during voir dire— the option of splitting the venire panel. *See Presley*, 558 U.S. at 215; *see also Steadman*, 360 S.W.3d at 505. In *Steadman*, the trial court considered several alternatives to closure, "but discounted them because they would compromise ordinary courtroom-security measures, would cause 'delay,' or were simply 'inconvenient.'" *Steadman*, 360 S.W.3d at 508. The Court of Criminal Appeals held the trial court had failed to consider "*all* reasonable alternatives" as required by *Presley* and *Waller*, including, specifically, "an alternative that would have solved both the jury-contamination issue and the courtroom-security issue: 'dividing the jury venire panel to reduce courtroom congestion.'" *Id.* at 509. Based on the trial court's failure to make findings specific enough to warrant closure of the courtroom during voir dire, and the court's failure to

---

[2] The record is also silent on whether a spectator could actually see and hear the voir dire proceedings from the vantage point of the foyer and thus whether the foyer was a reasonable accommodation.

consider all reasonable alternatives to closure, the Court held that Steadman's right to a public trial was violated. *Id.* at 510. Here, as in *Steadman*, the trial court considered one alternative, i.e., standing in the foyer, but failed to consider, and take, *all* reasonable measures to accommodate the public during the voir dire proceedings, including splitting the venire panel. *See id.* at 509; *see also Presley*, 558 U.S. at 214-15; *Lilly*, 365 S.W.3d at 331-32.

Further, the trial court's findings are not sufficiently specific with respect to its concerns regarding the risk of venire panel contamination, courtroom security, and space constraints, as well as its consideration of all reasonable measures to accommodate the public during voir dire. *See Steadman*, 360 S.W.3d at 506-08 (trial court failed to articulate a "tangible threat" based on concrete facts, citing only a broad and generic concern about possible panel contamination and security). Under *Presley,* both venire panel contamination and courtroom security could be sufficient overriding interests. *Presley*, 558 U.S. at 215. However, the record here does not include "findings specific enough that a reviewing court can determine whether the closure order was properly entered" based on either interest. *Press-Enterprise*, 464 U.S. at 510. Nowhere did the trial court point to specific, concrete facts of previous courtroom outbursts or attempts to influence panel members by Cameron's family or friends. The court made no findings that Cameron or her family or friends posed a courtroom security threat. *See Steadman,* 360 S.W.3d at 506. Further, the trial court's concerns regarding space, security, and panel contamination could have been addressed by relocating the trial, "dividing the jury venire panel to reduce courtroom congestion[,] or instructing prospective jurors not to engage or interact with audience members." *Presley*, 558 U.S. at 215. The trial court did not consider all reasonable alternatives to closure, notably, dividing the venire panel. Further, in rejecting relocation of voir dire to other courts or the central jury room, the court did not specify why those alternative locations were insufficient. *See Steadman*, 360 S.W.3d at 508 (concluding that the "delay" or "inconvenience" the trial court found would be

caused by relocating voir dire to the central jury room did not, by themselves, satisfy *Presley's* holding that neither convenience nor judicial economy can constitute an "overriding interest").

Based on the foregoing reasons, we conclude that the trial court, despite its commendable good faith efforts, failed to comply with the mandates of the Sixth Amendment. While the court offered an accommodation of allowing members of the public to observe the voir dire proceedings from the foyer, the record does not establish that any steps were taken to facilitate this proffered accommodation (i.e., propping open the doors)[3] and that the accommodation was reasonable. Further, the court did not consider all reasonable measures to accommodate the public during voir dire, notably failing to consider splitting the venire panel. Accordingly, we hold that Cameron's right to a public trial was violated. *See Presley*, 558 U.S. at 216; *see also Steadman*, 360 S.W.3d at 510. Because the error is structural error, the trial court's judgment must be reversed and the cause remanded for a new trial. *See Presley*, 558 U.S. at 216 (when the record fails to show the trial court considered *all* reasonable alternatives to accommodate the public, it is reversible error); *see Steadman*, 360 S.W.3d at 510-11 (when the constitutionally tainted portion of trial encompasses the entire jury selection process, relief involves a new voir dire and a new jury, thereby necessitating a new trial).

Given our disposition of this issue, we need not reach the other appellate issues raised by Cameron. *See* TEX. R. APP. P. 47.1. Accordingly, we reverse the trial court's judgment and remand for a new trial.

Rebeca C. Martinez, Justice

---

[3] We acknowledge that the possibility of a fire code violation was raised, but this Court's recent opinion in *Garcia v. State* rejected this concern, recognizing that "[c]learly, the trial court has some responsibility for complying with applicable safety regulations, but that responsibility does not excuse the trial court from considering other alternatives to closing voir dire." *Garcia v. State*, 401 S.W.3d 300, 304 (Tex. App.—San Antonio 2013, pet. ref'd).

PUBLISH