**Opinion issued June 3, 2014.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-13-00372-CR

————————————

**MANUEL RICHARD PENA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 338th District Court**
**Harris County, Texas**
**Trial Court Case No. 1320965**

---

## O P I N I O N

A jury found Manuel Pena guilty of the offense of murder and sentenced him to life confinement in the institutional division of the Texas Department of Criminal Justice. Pena appeals, arguing that the evidence was legally insufficient to support his conviction, that he was deprived of his right to a public trial under

the Sixth Amendment to the United States Constitution, and that the trial court erroneously admitted testimony by a witness who lacked personal knowledge of the subject matter to which he testified. Finding no error, we affirm.

## Background

### A. The death of Sherri Strong

On June 16, 1982, paramedics responded to a report of a suicide in Pena's Harris County residence. On their arrival, a male answered the door and escorted the paramedics to the garage, where they found a young, unclothed woman lying face down on the floor with a rope around her neck, which the paramedics cut off. The woman, Sherri Strong, was dead. When the paramedics turned her over, they discovered that blood was pooling in the front of her body, a post-death condition known as lividity.

Harris County Sherriff's Office Detective D. Parsons was dispatched to the scene to investigate. Detective Parsons testified that he noticed a series of injuries on Strong's body, including two sets of bruises on her neck: one in an upward line toward her ears, and the other a horizontal line around her neck. Parsons interviewed Pena at the scene. Pena disclosed that he and Strong had been the only people in the house that night. He and Strong were not married, but had been involved in a romantic relationship, and Pena stated that he believed that Strong was two months pregnant with his child at the time of her death. Pena, however,

2

was engaged in a contentious divorce proceeding with his wife and, on his attorney's advice, had previously evicted Strong from the home that they were sharing. Strong had become upset after intercepting a telephone message from Pena's wife, in which the latter expressed a desire to reconcile with Pena. Nonetheless, according to both Pena and Strong's brother, Strong had been a happy person; neither believed her to be suicidal.

During his interview with Parsons, Pena described the events of the night of Strong's death. According to Pena, the couple went to dinner, returned home, and had sex in his bed before going to sleep. Pena later woke up, discovered that Strong was not there, and saw a light in the kitchen. On reaching the kitchen, he followed the light to the garage, where he found Strong hanging by her neck on a rope tied to a hook in the ceiling that also supported a large punching bag. Pena retrieved a knife and cut down Strong's body.

Parsons did not find this story credible and testified as to several inconsistencies between his own observations and Pena's version of the facts. First, Pena's bed was neatly made except for the side where Pena had slept. Second, Parsons noticed the lividity in Strong's body; the lividity was not in her feet or legs, as Parsons expected, but only in the front of her body. Parsons also noticed bruises on Strong's leg and face and the two sets of markings on Strong's neck. In addition, he noticed significantly less bodily waste immediately under the

3

hook in the garage than he expected in the context of a hanging. From these observations, Parsons developed the belief that "someone actually strangled [Strong] facedown somewhere, possibly with the same rope, and then used it to hang her." Parsons considered Pena a suspect in Strong's death, but Pena was not arrested that night.

**B.     The autopsy of Strong's body**

Dr. Aurelio Espinola, then a deputy chief medical examiner for the Harris County Medical Examiner, performed an autopsy of Strong's body. Dr. Espinola testified that he had performed "hundreds to probably thousands" of autopsies of persons who had committed suicide by hanging. Dr. Espinola observed petechial hemorrhages—small breaks in the blood vessels—in Strong's upper eyelids, which he testified happens routinely in the context of manual strangulation but not in the context of death by hanging. In the latter, the weight of the body cuts off blood flow both to and from the head, preventing the pressure buildup that causes such hemorrhages. By contrast, there were no petechial hemorrhages in Strong's legs, which Dr. Espinola would have expected if the body had been hanging for several hours.

Dr. Espinola also observed the two sets of markings on Strong's neck. He testified that the fatal wound was the horizontal one on the front and sides of the neck, which was consistent with a rope being wrapped around the neck, but was

4

not consistent with or indicative of a hanging, which would have left a mark on the back of her neck.

Dr. Espinola testified that Strong had many pre-death injuries that were consistent with a physical struggle but not with a hanging, including: an abrasion on Strong's chin consistent with a blow; a hemorrhage in the inside of her lips consistent with a blow; an abrasion on her shoulder consistent with "some kind of force being directed at or on the top surface of her shoulder;" injuries to her ankles, knees, right elbow, and knuckles consistent with striking, fighting, or kicking; bruises to her wrists consistent with someone grabbing them and pulling; a bruise on her right hand; and a bite mark on her breast.

Dr. Espinola observed hemorrhaging around muscles and connective tissue around the cornu of the hyoid bone in the front of Strong's neck. According to Dr. Espinola, such hemorrhaging is a "hallmark of the ligature strangulation," as opposed to death by hanging. Further, Dr. Espinola testified that it is impossible for a person to strangle herself, due to the fact that the individual would lose consciousness and blood flow would resume before the strangulation became fatal.

Finally, Dr. Espinola observed lividity in Strong's back, but not in the back of her legs. Based on this fact, Dr. Espinola concluded that Strong was not hanging when she died; even if she had died from hanging and been moved, he would still have found lividity in her feet and legs. Dr. Espinola also testified that

5

lividity does not set in for two hours after death and that the presence of lividity when paramedics arrived at Pena's home indicated that Strong had been lying on the ground for some time before their arrival.

Based on the totality of his observations during the autopsy, rather than any one fact, Dr. Espinola ruled that Strong "came to her death as a result of asphyxia due to ligature strangulation, Homicide."

## C. "Cold case" reexamination

Although Pena was not charged in the months after Strong's death, the case remained an open and unsolved homicide. In 2011, Harris County Sheriff's Office Sergeant E. Clegg reviewed the case, attempted to obtain evidence from the original investigation, visited the scene of Strong's death, and conducted follow-up interviews of Pena and several other witnesses. Clegg found several inconsistencies in Pena's retelling of events. Pena changed his story regarding how he found a knife to cut Strong down. He also told Clegg that he had used the rope on which Strong hung herself to lift the punching bag out of the way of cars in the garage, but Clegg testified and photographs introduced in evidence showed no pulley or other means by which the bag could have been moved or hoisted. Pena also told Clegg that he attempted CPR on Strong, but Clegg testified that this was inconsistent with physical evidence at the scene.

The case was reopened and a grand jury indicted Pena for murder. After a trial, the jury found him guilty as charged, sentencing him to life confinement. Pena timely appealed.

**Legal Insufficiency of the Evidence**

Pena first argues that the evidence was legally insufficient to support his conviction.

## A.  Standard of Review

When a defendant challenges the sufficiency of the evidence, this Court "must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and any reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt." *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S. Ct. 2781, 2788–89 (1979)). The Court may not substitute its judgment for that of the jury by reevaluating the weight or credibility of the evidence, but must defer to the jury's resolution of conflicts in the evidence, weighing of the testimony, and drawing of reasonable inferences from basic facts to ultimate facts. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). We apply the same standard to circumstantial and direct evidence. *Id.* Circumstantial evidence may be as probative as direct evidence, and circumstantial evidence alone can be sufficient to

establish a defendant's guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). The facts need not all point directly and independently to the defendant's guilt, but the cumulative effect of all incriminating facts must be sufficient to support the conviction. *Id.*

## B.  Analysis

Pena argues that no eyewitnesses or direct evidence established that he murdered Strong. Specifically, he complains that no DNA evidence or fingerprints were introduced, that there was insufficient evidence that Strong was murdered and did not commit suicide, and that there no evidence that, assuming Strong was murdered, Pena was the murderer.

As legal authority for his legal insufficiency arguments, Pena relies entirely on *Reedy v. State*, 214 S.W.3d 567 (Tex. App.—Austin, 2006, pet. ref'd), *abrogated by Hooper*, 214 S.W.3d at 15–17. In *Reedy*, the Austin Court of Appeals applied an incorrect legal sufficiency "inference stacking" analysis under which "[t]he stacking of an inference upon an inference is not considered evidence." *Id.* at 585 (citations omitted). The Court of Criminal Appeals has expressly rejected this mode of analysis, abrogating *Reedy* and explaining that "inference stacking has not been used in this Court's sufficiency of the evidence jurisprudence in over 50 years." *Hooper*, 214 S.W.3d at 15. "Inference stacking is not an improper reasoning process; it just adds unnecessary confusion to the legal

8

sufficiency review without adding any substance." *Id.* The correct test is that found in "*Jackson v. Virginia*, [under which] courts of appeals assessing legal sufficiency are to consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 15 (citing *Jackson*, 443 U.S. at 318–19, 99 S. Ct. at 2788–89).

Applying the *Jackson* standard, there was ample evidence upon which the jury could have based its verdict. The forensic evidence, including Dr. Espinola's testimony as to the significance of each injury in classifying a death as a homicide, was sufficient to allow a rational juror to conclude that Strong's death was caused by ligature strangulation rather than hanging. Further, both Pena's statements to law enforcement and Strong's brother's testimony reflected that Strong was a "very happy," non-suicidal person at the time of her death.

The evidence regarding Pena's relationship with Strong—including evidence of Strong's pregnancy and Pena's wife's desire to reconcile with Pena—would have permitted a rational juror to draw the inference that Pena's relationship with Strong was troubled. Further, the physical evidence contradicted Pena's account of a consensual sexual encounter with Strong the night of her death. This evidence

9

was sufficient to permit a rational juror to find that Pena had a motive to kill Strong.

Pena himself admitted that no one else was present in his home the night that Strong died. In light of these facts, having concluded that Strong had not committed suicide, the jury could have rationally inferred that Pena was the only person present when she died.

Further, Pena's statements to law enforcement were, in many details, contradicted by Pena's other statements or by the officers' observations of the scene of Strong's death. For example, he gave statements that officers testified were inconsistent with the physical evidence, such as where Strong slept and why there was a rope on the hook in Pena's garage. Such contradictions allow a reasonable juror to doubt Pena's version of events and conclude that Pena murdered Strong and then posed the scene to attempt to indicate a suicide. *See*, *e.g.*, *Cantu v. State*, 395 S.W.3d 202, 209 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (citing "inconsistencies in Cantu's statements" and statements inconsistent with physical evidence as bases for rational juror to doubt Cantu's defensive assertion).

The absence of DNA or fingerprint evidence at trial does not render the other evidence insufficient to support the conviction. First, Texas law does not require such evidence to support a criminal conviction. *See*, *e.g.*, *Garcia v. State*,

10

563 S.W.2d 925, 928 (Tex. Crim. App. [Panel Op.] 1978) (victim's testimony alone was sufficient to sustain rape conviction, despite lack of physical evidence); *Sims v. State*, 84 S.W.3d 768, 774 (Tex. App.—Dallas 2002, pet. ref'd) (conviction upheld when victim's testimony identified defendant as attacker, despite absence of "scientific evidence"). This is especially true when the scene of the crime was the defendant's home—where one would expect to find the defendant's fingerprints and DNA—and the defendant's narrative of innocence includes physical contact with the deceased. Dr. Espinola testified that DNA testing first became available as a forensic tool in 1986, four years after Strong's death; it was not standard to preserve potential DNA evidence prior to that time. The mere absence of DNA and fingerprint evidence does not affect the legal sufficiency of the evidence actually introduced at trial. *See*, *e.g.*, *Garcia*, 563 S.W.2d at 928; *Sims*, 84 S.W.3d at 774; *Padilla v. State*, 278 S.W.3d 98, 105 (Tex. App.—Texarkana 2009, pet. ref'd).

Because the evidence was legally sufficient to support Pena's conviction of murder, we overrule Pena's first argument.

## Sixth Amendment Violation

Pena next argues that the trial court failed to hold a public trial because it closed the drape over the courtroom's windows to block the public's view of the trial, in violation of Pena's rights under the Sixth Amendment to the United States

Constitution. Specifically, during Dr. Espinola's testimony, the State introduced into evidence graphic photographs from the autopsy, and the following exchange occurred between one of the prosecutors and the trial court:

> MS. ALLEN: Your Honor, may we approach just for a real quick—
>
> THE COURT: Yes.
>
> (At the Bench, on the record.)
>
> MS. ALLEN: Earlier there had been some media stuff about this. I don't know why they're interested [in] it, but could we have the drape closed if we're about to do the autopsy photos? I just don't want—I don't mind doing it, if that's okay with you.
>
> THE COURT: I'll have Frank do it.

Pena's counsel did not object at any point during this discussion or otherwise raise a Sixth Amendment argument in the trial court. The record does not reflect the nature of the drape in question, whether Frank in fact closed the drape, what the drape would have concealed, if anything, whose view would have been obstructed, if anyone's, or how long the drape was closed. Pena argues that the drape covered windows to the courtroom and its closure violated the rights of the public and the press to attend Pena's trial. *See*, *e.g.*, *Lerma v. State*, 172 S.W.3d 219, 228 (Tex. App.—Corpus Christi 2005, pet. ref'd) (in general, Sixth Amendment right to public trial includes requirement that media have access as "an extension of the public body").

12

## A.    Standard of Review

The Sixth Amendment of the United States Constitution provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. CONST. amend. VI. This right is a structural requirement of the Constitution and is therefore a structural right, such that Sixth Amendment errors are "categorically exempt from harm analysis." *McEntire v. State*, 265 S.W.3d 721, 722 (Tex. App.—Texarkana 2008, no pet.) (citing *Arizona v. Fulminante*, 499 U.S. 279, 309, 11 S. Ct. 1246, 1264–65 (1991); *Salinas v. State*, 980 S.W.2d 219, 219 (Tex. Crim. App. 1998)). Nonetheless, "[w]here a defendant, with knowledge of the closure of the courtroom, fails to object, that defendant waives his right to a public trial." *United States v. Hitt*, 473 F.3d 146, 155 (5th Cir. 2006); *see also Turner v. State*, 413 S.W.3d 442, 447 (Tex. App.—Fort Worth 2012, no pet.) (because "a complaint that the right to a public trial was violated is . . . subject to procedural error preservation rules," defendant must object to closure of courtroom with sufficient clarity "to provide the trial court and opposing counsel an opportunity to address and, if necessary, correct the purported error"); *Lilly v. State*, 365 S.W.3d 321, 326 (Tex. Crim. App. 2012) (refusing to address appellant's right to public trial claims under the Texas Constitution and Code of Criminal Procedure because appellant failed to brief those arguments and authorities separately from his arguments under the United States Constitution);

*McEntire*, 265 S.W.3d at 722–23 (holding that defendant failed to preserve Sixth Amendment public-trial argument where his counsel stated that he had no objection to closing part of trial to public).

Assuming a defendant has preserved a Sixth Amendment argument, "the first step for a reviewing court when analyzing whether a defendant's right to a public trial was violated is to determine if the trial was, in fact, closed to the public." *Lilly*, 365 S.W.3d at 329. "Once it is determined that the defendant's trial was closed to the public, the reviewing court decides whether that closure was proper." *Id.* The Court of Criminal Appeals is currently reviewing this requirement. *See Cameron v. State*, 415 S.W.3d 404, 409–10 (Tex. App.—San Antonio 2013, pet. granted). In *Cameron*, two justices interpreted *Lilly* not as requiring a showing that someone was excluded from a trial, but characterized *Lilly* as a requirement that a court of appeals review "the totality of the evidence and determine whether the trial court fulfilled its obligation 'to take every reasonable measure to accommodate public attendance' . . . ." *Id.* at 409.

The Sixth Amendment does not confer a right upon the media or anyone else to record courtroom proceedings. Rather, the public's right of access is constitutionally satisfied when members of the public and the media are able to attend the trial and report on their observations. *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 610, 98 S. Ct. 1306, 1318 (1978); *see also Estes v. Texas*, 381 U.S.

14

532, 584, 85 S. Ct. 1628, 1654 (1965) (Warren, C.J., concurring) ("[A] trial is public, in the constitutional sense, when a courtroom has facilities for a reasonable number of the public to observe the proceedings, . . . when the public is free to use those facilities, and when all those who attend the trial are free to report what they observed at the proceedings.").

**B.    Analysis**

By failing to object to the alleged closing of the trial to the public or otherwise raise the issue with the trial court, Pena has waived his Sixth Amendment argument. *Lilly*, 365 S.W.3d at 326; *McEntire*, 265 S.W.3d at 722–23. Even if Pena had preserved this argument, he has failed to demonstrate that his trial was closed to the public, as required by *Lilly*, or that the trial court did not accommodate public viewing of the trial, as required by *Cameron*. The record does not even reveal that the drape was closed or what the impact of its closure would have been on anyone's ability to attend or view the proceedings inside the courtroom. On the contrary, it appears that the drape in question, if it was closed, would merely have prevented photography or videotaping by persons outside the courtroom, which would not have violated Pena's Sixth Amendment rights. *Nixon*, 435 U.S. at 610, 98 S. Ct. at 1318.

We hold that Pena has waived his second argument.

15

**Improper Admission of Evidence**

Finally, Pena next argues that the trial court erred in admitting testimony by Sergeant Clegg regarding inconsistencies in Pena's narrative of events. During the trial, the following exchange took place:

> Q. During your interviews with the original officers, being [D.] Parsons and [L.] Kincaid, were there inconsistencies between what they said Mr. Pena said and what Mr. Pena was telling you?
>
> > MR. McDONALD [Pena's counsel]: Judge, I'm going to object. He's testifying to – no personal knowledge of what my client told two officers back in 1982.
> >
> > THE COURT: Overruled.
>
> A. There were inconsistencies, yes, ma'am.

Pena argues that this testimony should have been excluded under Texas Rule of Evidence 602, which provides, "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." TEX. R. EVID. 602. Specifically, Pena argues, "There was no testimony introduced at trial to show that Clegg personally heard what Pena told Parsons and Kincaid." For this reason, Pena argues that Clegg "lacked personal knowledge of his testimony."

## A.   Standard of Review

We review a trial court's evidentiary rulings under an abuse of discretion standard. *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001). We will

not disturb the ruling if it "was within the zone of reasonable disagreement and was correct under any theory of law applicable to the case." *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007); *see also Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002) ("[T]he appellate court must uphold the trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case.").

## B.    Analysis

At issue is whether Clegg had sufficient personal knowledge to testify regarding differences between what Pena told him and earlier officers. Pena argues that Clegg's testimony should have been excluded because Clegg did not personally hear what Pena told Parsons and Kincaid, and thus lacked personal knowledge to support his testimony. But Clegg was not asked what Pena told Parsons and Kincaid. Rather, he was asked about "what they said Mr. Pena said."

Clegg testified that he, along with one other officer, interviewed Pena in 2011 and recorded the entire conversation by both video and audio. This testimony was sufficient to establish that Clegg had personal knowledge of what Pena told him in 2011. Clegg also testified that he interviewed Parsons and Kinkaid in 2011 regarding what Pena told them in 1982. In addition, Clegg reviewed the written record of Parsons's 1982 interview of Pena. This evidence was sufficient to show that Clegg had personal knowledge of what Parsons and

17

Kincaid had reported to Clegg that Pena had said.  There being no other objection to the question, we hold that the trial court's admission of Clegg's testimony is reasonably supported by the record.  *See Winegarner*, 235 S.W.3d at 790; *Willover*, 70 S.W.3d at 845.  Accordingly, we overrule Pena's final argument.

## Conclusion

We affirm the judgment of the trial court.


Jane Bland
Justice

Panel consists of Justices Keyes, Bland, and Brown.

Publish.  TEX. R. APP. P. 47.2(b).