**Affirmed as Modified; Opinion Filed August 12, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-01199-CR

### PETER PHUC HONG TRAN, Appellant

### V.

### THE STATE OF TEXAS, Appellee

### On Appeal from the 296th Judicial District Court
### Collin County, Texas
### Trial Court Cause No. 296-81478-2012

## MEMORANDUM OPINION
Before Justices Lang, Brown, and Whitehill
Opinion by Justice Lang

The sole issue in this appeal from a jury conviction and twenty-five year sentence for murder[1] is whether the circumstantial evidence linking Peter Phuc Hong Tran to the murder is sufficient to support the conviction. We conclude it is and affirm the trial court's judgment.

### I. BACKGROUND

On February 19, 2012, around 8:00 p.m., Anne Nguyen came home to the house she shared with her thirty-three year old son Ethan Nguyen, found him lying on the floor covered in blood behind a couch in the living room, and called her sister who called 9-1-1. Nguyen had

---

[1] Tran was charged with capital murder. Specifically, the State alleged he caused Nguyen's death by stabbing him with a knife or unknown object while in the course of robbing or attempting to rob Nguyen. However, the jury, authorized to convict Tran of capital murder or the lesser included offenses of murder or aggravated robbery, found Tran guilty of murder.

been stabbed multiple times. Nguyen's iPhone, his watch, and a Louis Vuitton messenger bag containing his sunglasses were missing. There was no sign of forced entry into the house. However, an overturned chair by the front door and blood smears on the wall and window sill in the study suggested a struggle had occurred.

The police arrived within minutes of the 9-1-1 call and found blood throughout most of the house and on the front sidewalk. They also found a paper knife sheath on the kitchen floor, approximately $20,000 in cash in Nguyen's room and closet, and receipts in his room and car showing he had been shopping at a nearby mall and electronics store between 2:00 and 3:45 p.m. that day.

Over the next two days, officers interviewed friends and neighbors and reviewed security camera video footage obtained from the stores where Nguyen had shopped. The video footage showed Nguyen accompanied by an Asian male wearing white shoes, jeans, and a white "hoodie." This same male, later identified as Tran, was seen leaving Nguyen's house by one of his neighbors around 4:30 or 4:45 p.m. the day of the murder. Officers learned from the interviews Nguyen was a professional poker player who used Adderall, an amphetamine, so he could play poker "all night." Also, they learned Nguyen was expecting a shipment of 1,000 to 2,000 Adderall pills from the Cayman Islands, and any visitors he had at his house usually came late at night or early in the morning.

On February 22, 2012, Tran called the police department and asked one of the officers assigned to the murder if he could help in the investigation. The officer asked Tran if he would come to the station for an interview and bring with him the clothes he was wearing while with Nguyen. Tran agreed and met with officers that same day. However, he did not bring the clothes or shoes with him. When asked about those items, Tran replied the "hoodie" was Nguyen's and he returned it to him before parting ways. He said nothing about the jeans and stated the brown shoes he was wearing were the ones he wore while with Nguyen.

The police asked Tran how he spent his time with Nguyen the day Nguyen was murdered. Tran responded he met Nguyen at Nguyen's house around noon, and they left for the mall in Nguyen's car. On the way, they stopped at an ATM. Nguyen was carrying a "wad of cash" and bank card held together by a rubber band. He deposited $1600. Then, they had lunch and shopped. They returned to Nguyen's house around 4:00 p.m. Tran initially said he went to his car, but later in the interview, admitted he went into Nguyen's house for a short period of time. Tran saw one of Nguyen's neighbors walking by as he got in his car and left for his apartment. Tran texted and called Nguyen a few times later that evening and over the next two days, until he learned of Nguyen's murder.

Tran agreed to a second interview the following week. At that interview, he was asked if he had taken Nguyen's iPhone with him when he left Nguyen's house. Investigators had learned the night before that records of Nguyen's iPhone showed the phone active near Tran's apartment and in different locations along the path Tran told investigators he had taken after leaving Nguyen's house. Tran initially denied he had taken the phone, but later admitted he had accidentally taken it. He stated he drove to Nguyen's house the night of the murder to return the phone, but did not stop because the police were there. He later threw the phone in a dumpster. Asked again about the clothes he was wearing while shopping with Nguyen, he replied he threw the shoes away because one of them had a hole and also threw away the jeans because they "ripped." When asked if he killed Nguyen, Tran emotionally denied it.

Within a few days of the second interview, Tran vacated his apartment and moved to Wichita, Kansas. A search of Tran's apartment and forensic testing of five blood samples collected from Nguyen's house and the sidewalk revealed no evidence linking Tran to the murder. However, investigators concluded Tran killed Nguyen based on the records of Nguyen's cell phone, Tran's calling and texting Nguyen even though in possession of Nguyen's

–3–

phone, Tran's discarding Nguyen's iPhone and the shoes and jeans he was wearing the day of the murder, and his move to Wichita. Tran was arrested in Wichita on May 7, 2012.

At trial, Nguyen's friends Austin Jeng, Dylan Cheng, and Philephone Just testified Nguyen and Tran knew each other from playing poker. Nguyen was a successful player known to carry in his front pocket "a lot of cash," usually "hundred dollar bills tied up with a rubber band around it so the money [was] visible whenever he took it out." Tran, on the other hand, was in debt, struggling financially, and was relatively new at playing poker. According to the witnesses, Nguyen "took him in as a student" and lent him money. Following Nguyen's death, Tran contacted Cheng and Just several times, scared and worried that investigators would "pin" the murder on him since he was the last person with whom Nguyen was seen. Tran also asked Cheng if he could borrow money.

The apartment manager where Tran lived before moving to Wichita testified she was contacted by the police shortly after the murder and informed Tran was considered a suspect. She asked Tran what had happened, and Tran told her the murder occurred after a fight during a poker game. Tran also told her the police were looking for a Louis Vuitton bag.

Detective Charles Marks testified several officers were involved in the investigation, but he was the "case manager" or lead detective. According to Marks, no evidence was found suggesting the person who killed Nguyen was "looking for things to steal." The bedrooms were "undisturbed," no electronic devices were taken, and the cash found in Nguyen's room and closet appeared "untouched." However, the cash Tran reported Nguyen had in his pocket the day he was murdered was not found on his person when police arrived at the house.

Marks testified officers collected "DNA samples" from many of Nguyen's friends, but only Tran's was tested. Marks explained Tran was the only suspect "developed" from the information gathered during the investigation. Tran was the person last seen with Nguyen and

the only one who gave inconsistent statements. Also, the "hoodie" Tran claimed to have returned to Nguyen was not found in Nguyen's house or car.

Based on the information gathered and interviews with Tran, which were played to the jury, Marks put together a timeline showing the events of the day of the murder:

| | |
|---|---|
| 10:30-10:45 a.m. | Nguyen's mother sees and talks to Nguyen. |
| 12:15 p.m. | Text indicates Tran is at Nguyen's house. |
| 12:52 p.m. | Nguyen makes ATM deposit of $1600. |
| 1:08 p.m. | Nguyen and Tran park at the mall. |
| 1:10 p.m. | Nguyen and Tran have lunch. |
| 2:08 p.m. | Nguyen and Tran start shopping. |
| 3:15 p.m. | Nguyen and Tran leave the mall. |
| 3:25 p.m. | Nguyen and Tran stop at a nearby electronics store. |
| 3:46 p.m. | Nguyen and Tran leave the electronics store. |
| 4:30/4:45 p.m. | Nguyen's neighbor notices Tran departing Nguyen's house. |
| 4:44 p.m. | Nguyen's iPhone "registers" a few miles from his house. |
| 4:51 p.m. | Tran texts Nguyen. |
| 5:20-5:42 p.m. | Nguyen's iPhone "registers" at different locations along the path Tran drove to his apartment and "rests" at Tran's apartment. |
| 6:27 p.m. | Nguyen's iPhone "registers" at a location near Tran's apartment. |
| 7:14 p.m. | Tran texts Nguyen. |
| 7:27 p.m. | Nguyen's iPhone registers at the same location it did at 6:27 p.m. |
| 8:17 p.m. | Nguyen's mother finds Nguyen. |
| 9:14 p.m. | Nguyen's iPhone registers near Tran's apartment. |
| 10:32 p.m. | Tran calls Nguyen. |
| 11:37 p.m. | Tran calls Nguyen again. |

11:41 p.m.        Tran calls Nguyen a third time, and Tran's cellphone registers near Nguyen's house.

On cross-examination, Marks acknowledged not all information gathered pointed to Tran. For instance, one of Nguyen's friends told Marks she did not think Tran was capable of murder. Another friend asked to be kept informed of the investigation, which Marks found "suspicious." Further, testing of the blood samples from the front sidewalk revealed the blood was of the same person, but the person was neither Nguyen nor Tran. Marks testified had additional blood evidence found inside the house been tested, a possibility existed that those samples might have matched the samples from the sidewalk.

Marks also acknowledged officers did not follow-up on all information gathered. One example was that a search of Nguyen's computer indicated Nguyen spent "a lot of time interacting socially on the internet" and visiting many "sexually oriented" websites. Although Nguyen had a girlfriend, many friends questioned his sexual orientation. Yet, officers did not investigate Nguyen's online activity or ask that a sexual assault exam be performed following his murder. Similarly, officers did not investigate further the allegation that Nguyen was expecting a large supply of Adderall.

## II. SUFFICIENCY OF EVIDENCE

In his sole issue, Tran asserts the State failed to prove Tran was the murderer. He contends the State presented only three pieces of evidence to establish his guilt: (1) he was with Nguyen the day of the murder; (2) he did not bring the clothes he wore while with Nguyen; and (3) he initially denied taking Nguyen's iPhone, but later admitted he took it by accident. Relying on *Winfrey v. State*, 393 S.W.3d 763 (Tex. Crim. App. 2013), Tran contends the circumstantial evidence the State presented against him is insufficient to support the conviction.

### A. Standard of Review

In evaluating the sufficiency of the evidence to support a conviction, an appellate court applies *Jackson v. Virginia*, 443 U.S. 307 (1979) and considers all the evidence in the light most favorable to the trial court's judgment to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Winfrey*, 393 S.W.3d at 768. Under this standard, direct and circumstantial evidence cases are treated equally, and circumstantial evidence alone can be sufficient to establish guilt. *See Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Because the factfinder is the sole judge of the witnesses' credibility and the weight to give the evidence, the appellate court defers to the trier of fact's resolution of any conflicts in testimony, weight of the evidence, and inferences drawn. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010); *Hooper*, 214 S.W.3d at 13 (quoting *Jackson*, 443 U.S. at 318-19).

### B. Applicable Law

The Texas Penal Code provides, in relevant part, that a person commits murder if he intentionally or knowingly causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011).

### C. Winfrey v. State

*Winfrey* is a circumstantial evidence case in which the court of criminal appeals reviewed the sufficiency of the evidence to support Megan Winfrey's conviction for the murder of Murray Burr.[2] *Winfrey*, 393 S.W.3d at 764-65, 767. Burr, who worked at the high school Winfrey attended, was found in his home with multiple stab wounds and "sharp-and-blunt-force injuries." *Id.* at 764. Missing from his house were a Bible and two guns. *Id.* at 765. Although no physical evidence linked Winfrey to the murder, no evidence showed she was at Burr's house the day of

---

[2] The court also reviewed the sufficiency of the evidence to support her conviction for conspiracy to commit capital murder. *See Winfrey*, 393 S.W.3d at 773-74.

the murder, and no evidence connected her to the missing Bible and guns, two dogs "alerted" Winfrey's scent being on Burr's clothes. *Id.* at 765-66. Additionally, testimony at trial showed (1) Winfrey believed Burr had money in his home, and she wanted it; (2) Winfrey's father related to his jail cellmate specific information about the murder, including that guns had been stolen, and at the time father related the information, officers did not yet know the guns were missing from Burr's house; (3) Winfrey asked her boyfriend to take her to her ex-husband's house, allegedly to discuss their daughter, but in reality to discuss a possible alibi for the night of the murder; (4) after her ex-husband was subpoenaed, Winfrey called her ex-mother-in-law to see if her ex-husband was going to testify; (5) when she learned law enforcement personnel had found a hair at the crime scene, Winfrey shaved herself, allegedly to prevent the taking of a sample of her hair; and (6) Winfrey told her boyfriend she went to Burr's house because "it was an easy lick," which the boyfriend construed to mean Winfrey thought she would get money. *Id.* at 770-71. Reviewing this evidence in conjunction with the remaining evidence in the light most favorable to the verdict, the court found the evidence more speculative than inferential and concluded it was legally insufficient to support the conviction. *Id.* at 771-73. In reaching its conclusion, the court stated "[b]asing a finding of [Winfrey's] guilt on this [circumstantial] evidence is, at best, "mere theorizing or guessing about [her] possible guilt rather than a reasonable inference based upon evidence and facts presented." *Id.* at 772.

*D. Application of Law to Facts*

We cannot agree with Tran's contention that the record reflects no more than three pieces of evidence that might support his guilt. Further, we conclude *Winfrey* is distinguishable from this case before us. Unlike the record in *Winfrey* which contained no evidence that Winfrey was seen at Burr's house the day of the murder, was found in possession of Burr's property, or moved after the murder, the record here reflects abundant evidence pointing to Tran's guilt. Not only was Tran with Nguyen the day of the murder, but he was the person last seen with Nguyen.

–8–

A neighbor of Nguyen saw Tran leaving Nguyen's house around 4:30 p.m. that day. He also admitted he was at Nguyen's house at that time. Further, Tran was found to have possession of Nguyen's iPhone minutes later. He texted and called Nguyen even though in possession of Nguyen's phone, and subsequently threw the phone in a dumpster rather than giving it to the police. Also, Tran moved out of town while the investigation was on-going. We note further, unlike *Winfrey* where the record reflected Winfrey wanted Burr's money, but not that she was in need of money, the record here reflects a motive for the murder. Tran was in debt and needed money. Tran knew Nguyen was carrying a "wad of cash," and that money was not found on Nguyen. Finally, the record reflects not only that Tran did not bring the clothes he was wearing while with Nguyen, but also that he threw away the jeans he was wearing, the "hoodie" he stated he returned to Nguyen was not located, and he gave inconsistent statements regarding the shoes.

On the record before us, we conclude the jury could have reasonably inferred Tran killed Nguyen. We must defer to the jury's decision. *See Hooper*, 214 S.W.3d at 13; *Pena v. State*, 441 S.W.3d 635, 641 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (evidence that (1) victim's death caused by strangulation rather than hanging, (2) relationship between victim and defendant was troubled, and (3) defendant's statements to law enforcement were contradicted by defendant's other statements or by officers' observations of crime scene sufficient for jury to infer defendant murdered victim); *see also*, *e.g.*, *Gear v. State*, 340 S.W.3d 743, 747-48 (Tex. Crim. App. 2011) (inconsistent statements considered affirmative evidence of guilt); *Middleton v. State*, 187 S.W.3d 134, 138 (Tex. App.—Texarkana 2006, no pet.) (possession of stolen property supports inference of guilt of offense in which property stolen); *Torres v. State*, 141 S.W.3d 645, 660-61 (Tex. App.—El Paso 2004, pet. ref'd) (evidence defendant last seen with victim considered affirmative evidence of guilt). Although Marks acknowledged not all information gathered pointed to Tran and officers did not investigate every piece of information

received, the legal sufficiency standard of review requires the evidence be viewed in the light most favorable to the verdict. *See Winfrey,* 393 at 768. We decide Tran's sole issue against him.

### III. MODIFICATION OF TRIAL COURT'S JUDGMENT

Although Tran was found guilty of murder, alleged to have been committed by stabbing Nguyen with a knife or an unknown object, the trial court's judgment does not contain a deadly weapon finding. *See* TEX. PENAL CODE ANN. § 1.07(a)(17) (West Supp. 2014) (defining "deadly weapon" as "anything that in the manner of its use or intended use is capable of causing death or bodily injury."). In a cross-point, the State asserts the judgment should be modified to include the finding.

An appellate court has the authority to modify an incorrect judgment to include an erroneously omitted deadly weapon finding. *Asberry v. State*, 813 S.W.2d 526, 529-30 (Tex. App.—Dallas 1994, pet. ref'd). A verdict of murder includes a finding that a deadly weapon was used. *See Crumpton v. State*, 301 S.W.3d 663, 664 (Tex. Crim. App. 2009). Accordingly, we decide the State's cross-point in its favor and modify the portion of the judgment entitled "Findings on Deadly Weapon" to reflect "Yes, not a firearm." *See* TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27-28 (Tex. Crim. App. 1993); *Asberry*, 813 S.W.2d at 531.

### IV. CONCLUSION

As modified, we affirm the trial court's judgment.

/Douglas S. Lang/
DOUGLAS S. LANG
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
131199F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

PETER PHUC HONG TRAN, Appellant

No. 05-13-01199-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 296th Judicial District Court, Collin County, Texas
Trial Court Cause No. 296-81478-2012.
Opinion delivered by Justice Lang. Justices Brown and Whitehill participating.

Based on the Court's opinion of this date, we **MODIFY** the portion of the trial court's judgment entitled "Findings on Deadly Weapon" to reflect "Yes, not a firearm."

As **MODIFIED**, we **AFFIRM** the judgment.

Judgment entered this 12th day of August, 2015.