**Opinion issued July 6, 2021**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-19-00942-CR

————————————

**DOMINIQUE CURRY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 339th District Court
Harris County, Texas
Trial Court Case No. 1521008

## MEMORANDUM OPINION

A jury found appellant, Dominique Curry, guilty of murder, and the trial court assessed his punishment at imprisonment for 40 years. In his sole appellate issue, Curry argues that the trial court erred in denying his motion for directed verdict because the evidence was insufficient to prove that the complainant was murdered

or that he was criminally responsible for her death. Because we conclude that there was sufficient evidence for the jury to have rationally found Curry guilty beyond a reasonable doubt, we affirm.

## Background

The complainant in this case, Brenae Thompson, was dating Curry. In August 2016, Thompson was living at the Catalina Village Apartments in Harris County, Texas. On the morning of August 7, 2016, Thompson entered the apartment complex driving her black Toyota Camry at 6:11 a.m., and a security video showed that she was driving with an unidentifiable person in the passenger seat. One of Thompson's downstairs neighbors, Sammy Curtis, heard something like "tussling" or fighting—a frequent occurrence at Thompson's apartment—and then a pop that sounded like a gunshot. The gunshot woke Sammy Curtis's wife, Tamika Curtis, and they heard someone walking down the stairs. Sammy Curtis went to look out his window and saw a man get into the black Camry and drive away. Tamika Curtis likewise saw the black Camry speed away. Security videos showed that the vehicle exited the complex at 6:23 a.m.

Thompson's next-door neighbor, April Morris, walked out of her apartment at approximately 6:30 a.m. on her way to work, and she saw Thompson laying on the ground outside her own apartment bleeding from what appeared to be a head wound. Morris called 9-1-1, but Thompson was already dead when the paramedics

arrived. The paramedic who responded to the phone call opened Thompson's apartment door. He saw a gun just inside the apartment and decided to wait for police to arrive before searching for additional victims.

Houston Police Department Detective C. Hogue testified that he was called to the scene of the shooting to investigate what had been categorized as a "suspicious suicide." Once he arrived, however, he determined that the shooting was a homicide, based on the facts that Thompson's body was outside her apartment, the door was closed, and the weapon was inside the apartment. He did not believe the scene of the shooting was consistent with a suicide. Police found a .40 caliber black and silver handgun at the scene with an empty casing nearby.

Police were able to determine that Thompson's vehicle was missing and began a search for the Camry. Thompson's vehicle was recovered from a hotel parking lot three days after the shooting. The keys, with her blood on them, were in the ignition and her glove box was open. Her wallet, containing identification and credit cards, was in the glove box.

During the subsequent investigation, police determined that Curry and Thompson had been in a dating relationship. The police also traced the handgun recovered at the scene of the shooting to its original purchaser, who in turn pointed them toward Curry. The police interviewed Curry, who told police that Thompson had picked him up and drove them to her apartment. Curry said that she was mad at

him because he had been cheating on her, and she threatened him with the gun—a gun he acknowledged belonged to him. He told police that he tried to leave, and then she committed suicide. He stated that she fell in the living room, and he panicked and left in her car. Curry denied shooting Thompson.

Curry was indicted for Thompson's murder based on allegations that he shot her with a firearm. At trial, in addition to the above evidence, the State presented testimony from the medical examiner. He testified that Thompson had been shot in the face, with the bullet fracturing several of her teeth before perforating her left carotid artery and jugular vein and then traveling to her chest cavity and perforating a lung. The medical examiner stated that the trajectory of the projectile was "downwards, front to back and right to left." Based on other damage and stippling at the entry site, the medical examiner testified that the gun was not touching her face at the time it was fired but it also could not have been more than two to five feet away. The medical examiner further testified that the manner and cause of death was homicide with a firearm, and he stated that the wound trajectory was not consistent with a self-inflicted gunshot.

Kristina May, a forensic chemist, testified that Thompson's hands were tested for gunshot residue. Thompson tested positive for gunshot residue on her right hand, and she was negative for gunshot residue on her left hand. May specifically testified that there were eight gunshot residue particles on the swab from Thompson's right

hand, "which is a positive result for gunshot residue indicating that the individual likely had some sort of association with the discharge of a firearm." May further explained that "association with the discharge of a firearm" "can mean that they fired the weapon, were in close proximity to the weapon when it was fired, or touched something that had [gunshot residue] on it."

Nikitra Pace, who had also dated Curry, testified that she had seen Curry with a gun on two occasions. She described it as a black and silver handgun, .40 or .45 caliber. On one occasion, Curry had left his gun out while a friend's young child visited, and Pace "was upset" that the child could reach it, so she put it away. On another occasion, she observed Curry and a friend "playing like they were going to shoot each other." She also knew that Curry and Thompson were acquainted, because she had seen Thompson's contact information in Curry's phone and had seen the two having conversations. She testified that Curry called her several times on the day that Thompson was murdered. Curry gave her some dirty clothes and a cell phone to get rid of, and she complied. She threw the clothing away because the items were muddy, wet, and "smelled bad." She gave the phone to a friend, but after police contacted her, she retrieved the phone and turned it over to police. The police did not obtain any information useful to the investigation from the cell phone.

After the State rested, Curry moved for a directed verdict on the basis that the evidence was insufficient to convict him of Thompson's murder. The trial court

denied the motion. The jury convicted Curry of murder, and the trial court assessed his punishment at 40 years' imprisonment.

## Sufficiency of the Evidence

In his sole issue on appeal, Curry argues that the trial court erred in denying his timely motion for directed verdict because the evidence was legally insufficient to support his murder conviction.

### A. Standard of Review

We review a challenge to a trial court's denial of a motion for directed or instructed verdict as a challenge to the legal sufficiency of the evidence. *See Canales v. State*, 98 S.W.3d 690, 693 (Tex. Crim. App. 2003); *Williams v. State*, 582 S.W.3d 692, 700 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd). When determining whether there is sufficient evidence to support a criminal conviction, we consider the combined and cumulative force of all admitted evidence in the light most favorable to the verdict to determine whether, based on that evidence and the reasonable inferences therefrom, a jury was rationally justified in finding guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Tate v. State*, 500 S.W.3d 410, 413 (Tex. Crim. App. 2016). We examine all the evidence in the light most favorable to the jury's verdict to determine whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 318–19; *Williams v. State*, 235 S.W.3d 742, 750 (Tex.

Crim. App. 2007). In our sufficiency review, we consider all the evidence in the record, whether direct or circumstantial, properly or improperly admitted, or submitted by the prosecution or the defense. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). The jury is the sole judge of credibility and weight to be attached to the testimony of witnesses, and juries may draw multiple reasonable inferences from the facts so long as each is supported by the evidence presented at trial. *Tate*, 500 S.W.3d at 413.

**B.    Analysis**

Curry argues that there was no evidence that he committed the offense of murder and that the forensic evidence and testimony of the State's experts created a reasonable doubt about the manner of Thompson's death. He asserts, "Ultimately, the evidence was legally insufficient to prove: 1) what type of conduct caused her death; 2) whose conduct caused the death; and 3) whether the conduct was committed with the requisite mens rea." Curry asserts that the evidence that Thompson was murdered, rather than committed suicide, was based on "little more than the fact that [the] medical examiner concluded that the manner of death was homicide based on an estimation of the trajectory of the gunshot." This is a mischaracterization of the evidence.

Security videos from the apartment complex showed that someone was with Thompson when she arrived at the apartment complex just minutes before the

7

shooting and that someone left in her car immediately after. Thompson's downstairs neighbor, Sammy Curtis, heard a scuffle or fight followed by a pop that sounded like a gun shot. Curtis looked out his front window and saw a man get into a black Camry and speed away. Whoever fought with Thompson fled without calling for help; rather, Thompson's neighbor, Morris, found her and called 9-1-1. Thompson's body was laying outside her apartment, and the gun was found inside the closed apartment, several feet away from her and behind a closed door. Her car was found abandoned days later, with her blood on the keys, indicating that someone who had interacted with her bleeding body had also touched the keys and driven the car. Detective Hogue testified based on his training and experience that he believed Thompson's death was a homicide, rather than a suicide. The medical examiner traced the trajectory of the bullet—from its entry at Thompson's lower lip, "downwards, front to back and right to left" through her neck to her left lung—and testified that it was not consistent with a self-inflicted wound. This evidence is sufficient for a jury to conclude beyond a reasonable doubt that Thompson was murdered. *See Jackson*, 443 U.S. at 318–19; *Williams*, 235 S.W.3d at 750.

Curry points to testimony from Kristina May, the forensic chemist, that Thompson had gunshot residue on her right hand. May testified that the "positive result for gunshot residue indicat[ed] that the individual likely had some sort of association with the discharge of a firearm." May further explained that "association

8

with the discharge of a firearm" could mean that she "fired the weapon, [was] in close proximity to the weapon when it was fired, or touched something that had [gunshot residue] on it." This testimony does not compel a conclusion that Thompson shot herself. The jury could have concluded that she came into contact with gunshot residue because the firearm was fired in close proximity to her body or as part of the "tussle" or fight overheard by neighbors. When considered along with the combined and cumulative force of all admitted evidence in the light most favorable to the verdict, we cannot conclude that the gunshot-residue evidence was so significant as to prevent the jury from concluding beyond a reasonable doubt that a murder occurred. *See Jackson*, 443 U.S. at 318–19; *Tate*, 500 S.W.3d at 413.

Curry further asserts that the State "had no DNA evidence to tie [him] to the scene or to the vehicle belonging to [Thompson]." He points out that, although there were several witnesses at the apartment, none of them could identify him as being involved with the shooting. We observe, however, that neither eyewitness testimony nor DNA evidence is necessary to support a conviction for murder. *See Gardner v. State*, 306 S.W.3d 274, 285–86 (Tex. Crim. App. 2009) (holding that evidence was sufficient to prove beyond reasonable doubt that defendant murdered victim despite lack of eyewitness testimony); *Pena v. State*, 441 S.W.3d 635, 641 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (holding that Texas law does not require DNA

or fingerprint evidence to support criminal conviction and that lack of such evidence does not affect sufficiency of other evidence introduced at trial).

The State presented evidence that Curry and Thompson had a dating relationship. Curry made a statement to police indicating that he was present when Thompson shot herself.[1] He further acknowledged owning the gun recovered from the scene, and Pace likewise testified that Curry owned a gun like the one that killed Thompson. The jury was entitled to believe Curry's statement that he was present at the time of the shooting but discredit his account of who pulled the trigger, especially in light of the medical examiner's testimony that Thompson's injury was not consistent with a self-inflicted gunshot. *See Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008) (jury may reject any part or all of witness's testimony in order to reconcile conflicts); *see also Tate*, 500 S.W.3d at 413 (holding that jury is sole judge of credibility and weight of witnesses' testimony and may draw multiple reasonable inferences from facts so long as each is supported by evidence presented at trial).

Finally, Curry argues there was no evidence that he knowingly or intentionally killed Thompson. Mental state can be inferred from actions, including actions such as use of a deadly weapon and fleeing the scene instead of calling for assistance. *See*

---

[1] Although Curry makes a passing statement that his statement to police was "incredibly coercive," he does not challenge the admissibility of the recorded statement.

10

TEX. PENAL CODE § 1.07(a)(17) (providing that firearm is deadly weapon); *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("Intent may also be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant."); *see also Devoe v. State*, 354 S.W.3d 457, 470 (Tex. Crim. App. 2011) (recognizing that flight is circumstance from which inference of guilt may be drawn); *Adanandus v. State*, 866 S.W.2d 210, 215 (Tex. Crim. App. 1993) (recognizing that jury may infer defendant's intent to commit murder from his use of deadly weapon in deadly manner and such inference is almost always conclusive); *Womble v. State*, 618 S.W.2d 59, 64–65 (Tex. Crim. App. 1981) ("[W]here a deadly weapon is fired at close range and death results the law presumes an intent to kill.").

We overrule Curry's sole issue.

## Conclusion

We affirm the judgment of the trial court.


Richard Hightower
Justice

Panel consists of Justices Hightower, Countiss, and Farris.

Do not publish. TEX. R. APP. P. 47.2(b).